**Edmund V. THOMPSON, Plaintiff-Appellant,**

v.

**ROCKWELL INTERNATIONAL CORPORATION, et al., Defendants-Appellees.**

No. 85–2285.

United States Court of Appeals, Tenth Circuit.

Feb. 12, 1987.

John W. Davis (John Mosby, Denver, Colo., and Elisa Moran, Shawnee, Okl., with him on briefs), Washington, D.C., for plaintiff-appellant.

Charles W. Newcom (Susan K. Grebeldinger, Sherman & Howard, Denver, Colo., and James Abrams, Golden, Colo., with him on brief), Sherman & Howard, Denver, Colo., for defendants-appellees.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and BROWN, District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

Plaintiff-Appellant Edmund V. Thompson ("Thompson") appeals from a decision of the District Court granting judgment for Defendants-Appellees Rockwell International Corp., Ronald Bradley and Charles Thery ("Rockwell") and dismissing his claims of race discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981. Ronald Bradley and Charles Thery, named as individual defendants, were employed by Rockwell at its Rocky Flats plant in Colorado as managers. Both of whom were supervisors of Thompson during the events which were relevant in this action.

The case was bifurcated upon the motion by Thompson. The parties tried the liability issue to the Court, sitting without a jury. Following the conclusion of Thompson's case-in-chief, Rockwell moved for a directed verdict on the basis that Thompson had failed to establish a prima facie case of race discrimination.[1] The District Court denied the motion and directed Rockwell to proceed with its evidence of non-discriminatory reasons for the employment decision. Throughout Rockwell's case-in-chief, Thompson was afforded the opportunities to challenge Rockwell's proffered reasons for this termination as being a pretext for a racially-motivated decision. The liability issue was fully tried on its merits. The District Court entered detailed findings of fact and concluded that the "evidence taken as a whole does not support either the claim of race discrimination or retaliation."

For reversal, Thompson has assigned four errors in this appeal. The first two issues concern his claims that the District Court applied the wrong legal standards to his version of discrimination in deciding this race-based employment discrimination case. The last two issues raise the contentions that the District Court's factual findings were "clearly erroneous" because they were not supported by the record.

Our task in reviewing the judgment of the District Court is well-established. Our primary appellate function is to review questions of law de novo in determining whether the District Court discerned and applied the proper legal standards to the

---

[*] Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. The District Court granted defendants' motion to dismiss Thompson's Title VII claims against individual defendants Bradley and Thery on the basis that Thompson failed to name either one in his EEOC complaint. ROA, Vol. III at 127. This ruling is not an issue in this appeal.

legal issues of the case. We may, under appropriate circumstances, review the District Court's factual findings and the application of the proper legal standards to the facts found. The factual questions, however, are reviewed according to the "clearly erroneous" standard. We have studied the record and considered the arguments. We are not persuaded that the District Court committed any reversible errors. We affirm the judgment of the District Court.

Viewing the evidence in the light most favorable to Rockwell, as we must at this juncture, *see Joyce v. Davis*, 539 F.2d 1262, 1264 (10th Cir.1976), the record reveals the following. Thompson is a black man who was employed by Rockwell at its Rocky Flats plant in Colorado from February 11, 1980, until his involuntary termination on September 16, 1983. During the events which were relevant in this action, Thompson worked as a machinist. From August 1982 to the date of his discharge from employment, he worked in a classified area which involved activities in handling radioactive materials.

His employment problems began in August 1981 when he received an unexcused absence. Thompson filed a grievance with his union, claiming that he should have been given sick leave for that absence because he had a doctor's statement to support his claim. He also made a similar complaint to Joyce Bolton, the Equal Opportunity Coordinator at the Rockwell plant. The record is not clear whether this dispute was resolved by the parties.

In early October, 1981, Thompson injured his foot at work. When he returned to work in November, 1981, Thompson requested his supervisor Ronald Bradley to place him on the third, or midnight shift. Thompson's medical release, however, restricted him from working in the midnight shift. When Bradley assigned him to the first, or day shift, Thompson insisted that he had the right under the union contract to work the midnight shift. He initially disobeyed the day shift assignment by Bradley by reporting to work on the third shift. Bradley explained to Thompson that

the management must enforce the medical restrictions, and that he would reassign Thompson to his preferred shift once the medical restrictions were lifted. Thompson was reassigned to the third shift when Thompson's doctor approved the midnight shift assignment.

In January 1982, a dispute arose between Thompson and his foreman about the manner in which he gave notice of intent to take vacation time. Thompson had been taking his vacation days on a day-to-day basis. On several occasions, Thompson failed either to give prior notice to his foreman or to call in on the day when he intended to take his vacation time. Rockwell treated those days on which Thompson failed to notify the management in a timely manner as unexcused absences, and issued a "Letter of Concern" on this matter. The letter stressed the company's policy which required Thompson to timely notify his supervisors whenever he would be absent from work.

On March 7, 1982, Thompson requested Bradley's permission to attend his uncle's funeral in California. Bradley gave Thompson a three-day leave and told him to report for work on the Thursday of the same week. Thompson did not return to work until the following week, even though he admitted that he did not travel to California for the funeral. Bradley issued a letter of reprimand to Thompson, underscoring the recurring problems of absenteeism and docking Thompson with unexcused absences for those days on which he did not report to work as scheduled.

In the same month, Bradley issued another letter to Thompson concerning the excessive sick leave requests by Thompson. Bradley directed Thompson to bring in a statement, signed by his doctor, to verify his illness on each request for sick leave. When Thompson failed to provide Bradley with the statement bearing the doctor's own signature, Bradley marked that absence as an unexcused one.

In April, 1982, Thompson requested leave to attend a ten-day military training with the National Guard. Rockwell approved

Thompson's request and provided him with an additional day for travel. He was scheduled to come back to work on April 11. Thompson, however, did not report for work until April 14. His supervisor charged him with two days of unexcused absence.

On April 15, 1982, Rockwell decided to suspend Thompson from work for ten days under the Rockwell's established system of "Progressive Discipline" [2] for Thompson's failure to comply with Rockwell's policy on work attendance. Thompson filed a grievance with his union, which was resolved on January 4, 1983 through a grievance settlement. The ten-day disciplinary suspension was reduced to five days.

In August 1982, Thompson was assigned to work in Module C, a unit at the Rocky Flats plant which handled radioactive materials. Thompson was given an eight-week training course in safety procedures on working with radioactive materials. Thompson completed the course and went to work in that unit on the midnight shift. His immediate supervisor was Ted Steger, who, in turn, was supervised by Charles Thery. Thery was one of the two individual defendants named by Thompson in the employment discrimination suit.

On April 5, 1983, Thery issued a letter of reprimand to Thompson for improperly activating an emergency alarm on March 24. Workers in Module C were instructed that the emergency alarm was to be used only when airborne radioactive contaminants had reached a predetermined level, at which time all employees were required to put on their respirators and leave the contaminated area. Further investigation of the false alarm incident suggested that Thompson apparently believed his co-worker had become contaminated. He activated the alarm only because his summons for a radiation monitor by telephone was not answered. The April 5th letter was reduced to a verbal reprimand.

On April 7, 1983, an attorney acting on behalf of Thompson wrote a letter to Rockwell, complaining of the five-day suspension, the changing of unexcused absences for taking improper funeral leave, military leave and sick leave. He asserted that the disciplinary measures imposed by Rockwell on Thompson for the alleged violations of company policy were based on racial animus. On May 24, Thompson filed a charge of discrimination with the EEOC, asserting these matters as outlined in his April 7th letter to Rockwell as well as the written warnings for his violations of safety procedures on April 30 and May 12 were racially motivated.

On June 15, 1983, Steger sent Thompson a letter of reprimand for excessive telephone use. The fact that Thompson spent an inordinate amount of time on the telephone while he was working was not denied by Thompson during the trial. On one occasion, Thompson left his machine running while he spoke on the telephone, an action for which Steger gave Thompson a verbal reprimand. On June 22, several gloves, some paperwork and a floor area were found contaminated by a machine in Thompson's work section. Although there was no conclusive determination that the contamination was caused by Thompson, Steger reviewed the safety procedures with Thompson upon the direction of Thery.

On July 5, 1983, Thompson was found to have been involved in a contamination incident. Steger summoned a radiation monitor Joseph Chinosi to examine Thompson. Chinosi found that there were high levels of radioactive contaminations in Thompson's mouth and nose. Thompson, however, refused to cooperate with Chinosi and to follow his instructions for decontamination. Rockwell had a strict safety rule that employees were not allowed to bring cigarettes into the working area of Module C. During the course of the examination, Chinosi discovered that Thompson had ciga-

---

**2.** The Rockwell's system of "Progressive Discipline" was explained by Jack Frazee, an employee relations administrator at the Rocky Flats plant, stating that an employee's misconduct was first warned by verbal reprimand, then by written reprimand, then by suspension, and finally by termination. ROA, Vol. VI at 99–100.

rettes in his pocket. Chinosi found that the cigarettes had also been contaminated. Chinosi took the cigarettes from Thompson and disposed of them in a wastebasket appropriately designed for contaminated articles. When Thompson tried to retrieve them, Chinosi firmly told Thompson that he could not have them back. This incident prompted Thompson's supervisor to issue a letter of concern and to impose a ten-day disciplinary suspension from work. This disciplinary suspension was the subject of a second charge of discrimination filed with the EEOC on July 15, 1983.

On July 28, 1983, Thompson and several co-workers left their work area early without permission. Thompson and all those who did so received a letter of reprimand from their supervisors. The next day, Thompson filed another charge of discrimination with the EEOC, claiming that he had been denied a temporary promotion to crew leader on the second shift.

On September 8, 1983, a supervisor, Walter Fleming saw Thompson in the break-room. It appeared to W. Fleming that Thompson, with his head down on a table, to be asleep. W. Fleming went to notify Thompson's supervisors, Steger and Stanley Fleming of his observation about Thompson. All three then went back to the break-room. Stanley Fleming approached Thompson and rapped on the table to arouse Thompson's attention and told him to go back to work. Thompson denied that he was sleeping, and claimed that he had his head on the table because he was having a headache. Thompson went back to his work station, but he did not finish the duties assigned to him on that shift. Instead, he went to use the telephone, claiming that he spoke with his attorney.

This incident was investigated by Thery, manager of Thompson's supervisors. They determined that Thompson had been away from his work station from 7:10 P.M. to 9:50 P.M., and that Thompson failed to perform those tasks assigned to him on that night. Thery reported his findings to Robert Brimble, an employee regulations administrator. Brimble decided that there were legitimate business reasons to terminate Thompson's employment on September 16, 1983, upon a review of Thompson's work history.

Thompson filed a grievance with his union for the involuntary discharge. He also filed his fourth charge of discrimination with the EEOC on September 23, 1983, alleging that the termination was motivated by racial animus. Throughout the grievance proceedings, there was an effort to reinstate Thompson. But Thompson rejected the reinstatement offer, because he refused to acknowledge either orally or in writing that he would comply with Rockwell's employment rules. The decision to discharge then became final.

Since the liability issue was fully tried on its merits, the District Court concluded that it needed not

> "follow the familiar sequential step analysis of prima facie case, defendant's articulated legitimate reason and pretext."

Rather, the District Court proceeded to focus its inquiry on the ultimate factual questions of whether or not a preponderance of the evidence demonstrated that Rockwell intentionally treated Thompson differently because of his race and that Rockwell retaliated against Thompson for his filing employment discrimination complaints with the EEOC. We conclude that the District Court properly applied the legal standards as delineated in *United States Postal Service v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), in deciding this race-based employment discrimination suit.[3]

---

**3.** In *United States Postal Service v. Aikens, supra,* a case upon which the District Court relied in deciding to bypass the traditional *McDonnell-Burdine* burden of proof rules applicable to a Title VII case, the Supreme Court observed that the distribution of burdens and the order of proof applicable to a Title VII case, "was 'never intended to be rigid, mechanized, or ritualistic,'" but "'is merely a sensible, orderly way to evaluate the evidence ... as it bears on the critical question of discrimination.'" 460 U.S. at 715, 103 S.Ct. at 1482. The *Aikens* Court emphasized and concluded that "'(w)here the defendant has done everything that would be

Because the District Court found that Rockwell did not act with the requisite discriminatory intent in terminating Thompson from employment, we proceed to review the propriety of that ultimate finding "of discrimination vel non." *Aikens, supra,* 460 U.S. at 714, 103 S.Ct. at 1481. The Supreme Court has made clear that discriminatory intent, although it is the ultimate issue in Title VII cases, is still a factual question to be reviewed under the "clearly erroneous" standard as prescribed in Rule 52(a), F.R.Civ.P., *Pullman-Standard v. Swint,* 456 U.S. 273, 285–287, 289–290, 102 S.Ct. 1781, 1788–1789, 1790–1791, 72 L.Ed.2d 66 (1982). *Accord Colon-Sanchez v. Marsh,* 733 F.2d 78, 80–81 (10th Cir.1984).

■ Our review of the factual findings by a district court is not de novo. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). We must give great deference to the factual determinations of the original finder of fact, who has the exclusive ability to assess the demeanor and the tone of the witnesses' testimony. In *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Supreme Court carefully drew the boundary of the "clearly erroneous" standard which we consider in reviewing the district court's findings of fact in a Title VII case. The *Anderson* Court stated:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though

convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

470 U.S. at 573, 105 S.Ct. at 1512. The Court further instructed the appellate courts on the treatment of findings of fact based on credibility determinations.

> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's finding; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations; for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence,

---

required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so (was) no longer relevant," *id.,* because the District Court had before it all the evidence it needed in order to determine the ultimate factual question of "whether 'the defendant intentionally discriminated against the plaintiff.'" *Id.* This was precisely the posture of the case presented to the District Court for decision on the liability issue when each of the parties concluded the presentation of its case. We disagree with Thompson's contention that Rockwell was required to prove its non-discriminatory reasons by a preponderance of the evidence to refute his "direct testimonial evidence"

of discrimination. Assuming the District Court found his "direct testimonial evidence" worthy of belief—which the District Court explicitly rejected by accepting Rockwell's explanations for the employment decision—we repeat the well-established evidentiary rule that the "ultimate burden of persuading the trier of fact," by direct or circumstantial evidence, "that the defendant intentionally discriminated against the plaintiff *remains at all times with the plaintiff*" in a Title VII case. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (emphasis added); *Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3.

that finding, if not internally inconsistent, can virtually never be clear error. Id. at 575–576, 105 S.Ct. at 1512–1513 (citations omitted).

Distilled to its essence, this case is a swearing contest. In finding that race was not a determinative factor in Rockwell's decision for discharging Thompson, the District Court, in effect, rejected Thompson's evidence and testimony in refuting Rockwell's explanations for its employment decision. Clearly, under the instructions in *Anderson, supra,* we should not reverse the District Court's acceptance of Rockwell's non-discriminatory reasons for discharging Thompson merely because we are of the view that the evidence should have been weighed differently. If we are to reverse the District Court's judgment, we must be convinced in our determination that the ultimate finding by the District Court is based upon an account of evidence that is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson, supra,* 105 S.Ct. at 1513.

Thompson contends that he produced "direct testimonial evidence" to support his claims that Rockwell discriminated against him on the basis of race. He points out that he was the only black employee in Module C, that he was the subject of racial remarks and slurs by his supervisors, Thery and Steger, that there was a severe personality conflict between him and his foremen, and that he was disciplined for misconduct for which similarly situated white employees were not disciplined. The District Court in its findings of fact carefully noted these factual allegations, viewing this testimonial evidence as providing a basis from which "possible inferences of racial discrimination in the course of plaintiff's employment" could be drawn. The District Court, however, also appropriately considered the documented evidence produced by Rockwell, which showed the various infractions of rules committed by Thompson. The District Court then carefully weighed all the evidence and arrived at this conclusion:

Despite these indications of an appropriate inference of discrimination, the court finds and concludes that Mr. Thompson's employment was terminated for valid business reasons, and that while individual incidents can be disputed, the evidence supports the view that Edmund Thompson was a very difficult employee who simply did not follow the rules and regulations of his employer and refused to accept supervision when the result disagreed with his personal desires and interests.

In addition to the specific factual finding that Rockwell had legitimate business reasons to discipline Thompson for his abuse of the privilege on funeral and vacation leaves, the District Court also found and concluded that there was credible testimony to demonstrate Thompson's insubordination with a radiation monitor in the July 5, 1983 contamination incident "was a very serious offense which could appropriately be considered for termination." Upon these factual findings, most of which were based on credibility determinations, the District Court concluded that the Rockwell's decision to terminate Thompson was based on the "cumulative result of difficulties" which Thompson had caused over the years, and that the evidence taken as a whole did not support a claim of discrimination or of retaliation.

■ We are satisfied that the District Court properly discerned and applied the governing legal standards. Further, we have reviewed the entire record and are convinced that the District Court's ultimate finding in Rockwell's favor is supported by substantial and competent evidence and not clearly erroneous. We affirm the judgment of the District Court.