**F I L E D**
United States Court of Appeals
Tenth Circuit

**MAY 6 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

ROBERT A. RASCON,

      Plaintiff-Appellee,

v.

U S WEST COMMUNICATIONS,
INC.,

      Defendant-Appellant,

_____

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Amicus Curiae.

No. 96-2194

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-94-524-LH)**

_____

E. Justin Pennington (Loretta Medina on the brief), Albuquerque, New Mexico,
for Plaintiff-Appellee.

James E. Hautzinger (Heather Fox Vickles with him on the brief), Sherman &
Howard, Denver, Colorado, for Defendant-Appellant.

C. Gregory Stewart, General Counsel; J. Ray Terry, Jr., Deputy General Counsel;
Gwendolyn Young Reams, Associate General Counsel; Lorraine C. Davis,
Assistant General Counsel and Robert J. Gregory, Attorney, Washington, D.C., on
the brief for Amicus Curiae Equal Employment Opportunity Commission.

Before **EBEL**, **McWILLIAMS**, and **HENRY**, Circuit Judges.

**HENRY**, Circuit Judge.

Following a bench trial, the district court entered judgment in favor of Mr. Rascon on his claim arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (1995). U S West appeals, arguing that the district court erred in various respects. Finding no error, we affirm.

## I. FACTS

Mr. Rascon suffers from posttraumatic stress disorder, presumably as a result of his service in Vietnam in 1968-69. This case arises from absenteeism caused by his participation in an in-patient posttraumatic stress disorder treatment program. While Mr. Rascon was participating in the program, U S West terminated his employment.

In 1971, Mr. Rascon began working for U S West as a Network Technician in Albuquerque. Although he received satisfactory to outstanding job performance ratings, he had problems with anger and fighting in the workplace. U S West suspended him eleven times and fired him three times due to fighting; however, it reinstated him each time.

2

In the early 1980's, U S West sent Mr. Rascon to an in-house anger management counseling program. A U S West Employee Assistance Counselor advised him that he had posttraumatic stress disorder. Mr. Rascon's symptoms included cluster headaches, insomnia, impaired ability to judge situations, difficulty in concentrating and controlling intrusive memories, flashbacks, anger, irritability, suspiciousness, hostility, and nightmares. In 1989, Mr. Rascon attended a posttraumatic stress disorder counseling program through the Albuquerque Veterans Administration (VA). This program involved individual therapy and weekly group sessions. Dr. Jose Canive supervised Mr. Rascon's therapy at the VA.

In 1991, Mr. Rascon received paid disability leave from U S West in order to attend a seven-week out-patient treatment program at the VA. U S West allowed him to work part-time during this treatment program. After completing the program, Mr. Rascon received additional leave in order to work half days for a period of three months. Even with this treatment, Mr. Rascon's posttraumatic stress disorder symptoms persisted. Dr. Canive, therefore, recommended that Mr. Rascon seek more intensive treatment from the National Center for Posttraumatic Stress Disorder in Menlo Park, California. Dr. Canive submitted an application to the Menlo Park program on behalf of Mr. Rascon.

On October 10, 1992, Mr. Rascon received notice that he would be granted a screening interview for admission into the Menlo Park Program. On January 6, 1993, he informed his supervisor, Lorrie Sullivan, that he would be attending the screening on January 21, 1993. He told Ms. Sullivan that he had posttraumatic stress disorder, and he tried to explain to her what it was and why he was seeking this type of treatment. When Ms. Sullivan became Mr. Rascon's supervisor (two months earlier), she did not know what posttraumatic disorder was. She testified that in January, Mr. Rascon told her he had "this Vietnam syndrome." Aplt's App. vol. IV at 463.

During the January 6th conversation, Mr. Rascon informed Ms. Sullivan that the program could take anywhere from six weeks to nine months, but that a four-month duration was likely. He requested a paid leave of absence under U S West's disability plan, but he told Ms. Sullivan that he wanted to participate in the Menlo Park program regardless of whether U S West approved a paid disability leave. The following day, Ms. Sullivan informed Mr. Rascon that U S West's Health Services Department needed further information in order to process his request for leave. He stated that he did not wish to contact Health Services and asked Ms. Sullivan to find out what information was needed.

On January 14, 1993 (Mr. Rascon's last day at work), Mr. Rascon attended a meeting with management and two union representatives. At that time, Ms.

4

Sullivan advised Mr. Rascon that U S West did not have enough information to grant a paid disability leave but that U S West would grant unpaid departmental leaves of absence, thirty days at a time, in order for him to attend the Menlo Park program. During this meeting with Ms. Sullivan, Mr. Rascon requested that U S West grant leave for the duration of his treatment, rather than in thirty-day increments. He reminded her that the estimated duration was four months. Ms. Sullivan denied this request. Ms. Sullivan did not discuss with Mr. Rascon various options under U S West's leave policies, including Personal Leave of Absence or Anticipated Disability Leave.

Ms. Sullivan prepared a memorandum, memorializing various aspects of the January 14th meeting. The memo, which Ms. Sullivan showed to Mr. Rascon before he left for Menlo Park, reiterated that U S West would reauthorize additional thirty-day leaves of absence as his treatment progressed, if he provided adequate information to Health Services. The memo stated that "[i]t would be best to provide authorization for Health Services to maintain contact and information sharing with all providers involved in the examination and/or treatment process. The best way to ensure that this process occurs smoothly is to complete a release and waiver before absence occurs." Id. vol. I at 75. The memo stated that Mr. Rascon or his doctors must apprise Health Services on a continuing basis that he was following recommended treatment in order for

5

Health Services to reauthorize thirty-day departmental leaves. It further stated that because Mr. Rascon had not supplied Health Services with what it considered sufficient information, U S West was denying paid leave.

After Ms. Sullivan showed Mr. Rascon the memo, he signed a release authorizing U S West's Health Services Department to maintain contact with his health care providers and gain access to his medical records. Mr. Rascon understood from Ms. Sullivan that signing the release was all that was required of him in terms of U S West accessing information regarding his disability. Id. vol. II at 86. Mr. Rascon signed two medical releases, one for the VA in Albuquerque, and one for the Menlo Park program. Id. at 162. The releases were valid for one year, unless revoked in writing.

The day after the meeting, just before Mr. Rascon left for Menlo Park, he spoke with Cindy Truitt, a counselor in U S West's Health Services Department in Denver. The conversation lasted for approximately one hour. During the conversation, Mr. Rascon explained his circumstances in detail to Ms. Truitt. Ms. Truitt informed Mr. Rascon that it was important that his doctors remain in contact with her. Ms. Truitt testified that she told Mr. Rascon a medical release was not enough and that it would be necessary for his doctors to remain in contact with her. Id. vol. V at 668.

Following this conversation, Dr. Canive and Ms. Truitt had a telephone conversation about Mr. Rascon. Just after the conversation, and in response to it, Dr. Canive mailed Ms. Truitt a letter providing the Health Services Department with requested information. In his letter, Dr. Canive explained that Mr. Rascon had been a patient in the posttraumatic stress disorder program at the VA in Albuquerque. Dr. Canive noted that despite Mr. Rascon's full cooperation in the program, his "irritability, anger, suspiciousness, hostility, nightmares, intrusive memories and insomnia continued to interfere with his daily living." Id. vol. I at 167. Dr. Canive explained the reasons for his referral of Mr. Rascon to the Menlo Park program. Dr. Canive stated that as a result of his posttraumatic stress disorder, Mr. Rascon "has been severely impaired both at work and at home. The fact that he continued to work in spite of his severe symptoms demonstrates his high motivation and work ethic." Id. at 168. Dr. Canive asked U S West to reconsider Mr. Rascon's case and grant him some disability income during his treatment at Menlo Park. He closed his letter by inviting Ms. Truitt to contact him if she needed further information. After Dr. Canive sent this letter to Ms. Truitt in early February, nobody from U S West contacted him for more information about Mr. Rascon. Id. vol. III at 252.

The Menlo Park treatment program admitted Mr. Rascon on January 21, 1993. Upon admission to the program, the doctors there diagnosed him with

7

posttraumatic stress disorder. His treatment in Menlo Park consisted of classes and intensive group and individual therapy sessions seven days a week, from approximately 8:00 a.m. to 5:00 p.m.

Mr. Rascon's first thirty-day departmental leave ran from January 21, 1993 to February 21, 1993. In a letter dated March 10, 1993, U S West authorized a second thirty-day departmental leave to run from February 22, 1993 to March 22, 1993. In that letter, Ms. Sullivan stated that "[t]he medical department of U S West has been unable to certify any disability due to inadequate information from your doctors." Id. vol. I at 61. However, in addition to her February conversation with Dr. Canive, in early March, Ms. Truitt spoke with Dr. Bernard Finley, Mr. Rascon's treating physician in Menlo Park. On March 4, 1993, Dr. Finley sent Ms. Truitt a report about Mr. Rascon's disability and treatment. Dr. Finley's report explained the reasons for Mr. Rascon's admission to the program, the nature of the therapy, and Dr. Finley's prognosis. It estimated that Mr. Rascon would need four months to complete the program. Dr. Finley's report also noted that Mr. Rascon "is working hard in treatment and has excellent motivation." Id. at 72. Dr. Finley opined that "[t]he outlook for [Mr. Rascon] is quite favorable for a much improved adjustment at home and at work." Id. He ended by thanking Ms. Truitt "for any assistance you can give to this very deserving combat veteran." Id.

On April 9, 1993, Ms. Sullivan sent Mr. Rascon a letter stating that his departmental leave had expired on March 22nd. The letter informed him that Health Services still did not have enough information. The letter stated that if U S West did not hear by April 23, 1993 that he continued to be receiving beneficial care or continued to qualify for benefits, then his name would be removed from the payroll. In effect, then, U S West granted a third thirty-day leave of absence, from March 22nd to April 23rd.

At some time in April, Dr. Finley discussed with Mr. Rascon U S West's request for additional information. Mr. Rascon stated that he was afraid U S West was "trying to get rid of him." Id. at 116. He asked Dr. Finley not to send U S West any further information; however, he did not revoke his medical release in writing. On April 16th, Dr. Finley spoke with Ms. Truitt about Mr. Rascon. Dr. Finley told Ms. Truitt that Mr. Rascon did not wish him to share any more information with U S West. According to union representative Bill Spina, Mr. Rascon's coworker, Mr. Rascon did not wish U S West to know every detail regarding his disability and its treatment. Id. vol. IV at 478.

On May 14, 1993, U S West sent Mr. Rascon a letter explaining that it had not received "information regarding your continuing participation in a program from which you are benefitting." Id. at 66. The letter stated that because the information was not forthcoming, U S West could not grant another thirty-day

9

departmental leave. In the letter, U S West informed Mr. Rascon, for the first time since he had requested leave in January, that he could apply for a personal leave of up to twelve months. The letter informed him that a personal leave of absence carried no guarantee of reinstatement. The letter went on to state that if Mr. Rascon did not apply for a leave of absence by May 24th, U S West would remove him from the payroll. In effect, then, U S West granted Mr. Rascon another thirty-day leave, from April 23rd to May 24th.

Mr. Rascon did not apply for personal leave. U S West notified Mr. Rascon of his termination effective June 7, 1993. The termination letter stated "we are unable to grant you another 30 day departmental leave of absence." Id. at 68. At the time of his termination, Mr. Rascon had four weeks of unused vacation. The termination letter stated that a check would be mailed to Mr. Rascon's residence for this unused vacation.

Each of the letters that U S West sent to Mr. Rascon was sent by certified mail to his residence and to the treatment facility in Menlo Park. It is disputed whether Mr. Rascon actually received the letters; however, he was aware of at least some of them through his conversations with Dr. Finley, who received copies of the letters. It is undisputed that neither Mr. Rascon nor his wife communicated directly with U S West while he was in the treatment program.

Mr. Rascon was released from the Menlo Park program on June 17, 1993. Dr. Canive testified that upon Mr. Rascon's return from Menlo Park, "his symptoms were improved and he felt content and happy, and he thought that he had accomplished something." Id. vol. III at 256. However, the improvement that Mr. Rascon made as a result of the program gradually diminished. The financial difficulties and stress of unemployment exacerbated Mr. Rascon's posttraumatic stress disorder symptoms. Id. at 256-57.

U S West's sickness and accident disability plan informed employees of the option of applying for social security benefits, which "are in addition to your benefits" under U S West's disability plan. Aple's Supp. App. at 76. While he was a patient in the Menlo Park program, Mr. Rascon met with financial difficulties because he was on unpaid leave. Another veteran at the hospital suggested he contact the Social Security Administration for assistance. Mr. Rascon applied for Social Security Disability Insurance benefits. In his application, he stated that he was totally disabled and unable to work. Mr. Rascon testified that upon completion of his treatment, he intended to relinquish his benefits and return to work. Aplt's App. vol. II at 113.

The Social Security Administration initially denied his application; however, it subsequently found Mr. Rascon disabled and awarded him benefits on December 19, 1993, six months after he was terminated from U S West. The

11

Administration found Mr. Rascon disabled as of January 21, 1993, the date of his admission to the Menlo Park program. Mr. Rascon continued to receive social security disability benefits at the time of trial.

## II. DISCUSSION

U S West presents five issues on appeal. U S West argues that the district court erred in: 1) refusing to apply the doctrine of judicial estoppel to bar Mr. Rascon's ADA claim based on statements he had made in connection with his application for social security disability benefits; 2) finding that Mr. Rascon had established a prima facie case of disability discrimination; 3) finding that Mr. Rascon's requested leave of absence was a reasonable accommodation; 4) finding that Mr. Rascon provided his employer with sufficient information regarding his disability and its treatment; and 5) awarding compensatory damages based on a finding of intentional discrimination.

We review the district court's findings of fact for clear error and its conclusions of law de novo. Estate of Holl v. C.I.R., 54 F.3d 648, 650 (10th Cir. 1995). When an issue presents a mixed question of law and fact, we use either the "clearly erroneous" or the "de novo" standard, "depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles." Id. The issue of the application of judicial estoppel presents a legal

12

question, and the remaining issues present mixed questions of law and fact, which we will delineate as we discuss them.

### A. The doctrine of judicial estoppel does not bar Mr. Rascon's ADA claim.

"Judicial estoppel bars a party from adopting inconsistent positions in the same or related litigation." United States v. 49.01 Acres of Land, 802 F.2d 387, 390 (10th Cir. 1986). U S West argues that because Mr. Rascon, in his social security application, took a position that U S West views as directly adverse to the position he now takes in his ADA claim, his lawsuit is barred by the doctrine of judicial estoppel. We rejected the doctrine of judicial estoppel in Parkinson v. California Co., 233 F.2d 432, 437-38 (10th Cir. 1956). We again refused to apply the doctrine in Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1520 n.10 (10th Cir. 1991). Recently we stated that "[w]e wish to make clear that under the law of this circuit, [an ADA plaintiff] is not judicially estopped from . . . making claims that are inconsistent with his prior representations to the [Social Security Administration] . . . . The precise impact, if any, of prior SSA representations on a plaintiff's ADA claim is still an open question in this circuit and one that we do not decide today." Smith v. Midland Brake, Inc., ____ F.3d ____, No. 96-3018, 1998 WL 110011, at *6 (10th Cir. March 13, 1998). The district court noted that the doctrine of judicial estoppel has been rejected in this

13

circuit, and, therefore, refused to apply the doctrine to bar Mr. Rascon's claim.[1] Aplt's App. vol. I at 54. On appeal, U S West invites us to adopt judicial estoppel where an ADA plaintiff has applied for or received disability benefits, but we decline.

In order to prove discrimination under the ADA, a plaintiff must prove that he or she is "a qualified individual with a disability." 42 U.S.C. § 12112(a). The ADA defines a qualified individual with a disability as one "who, with or without reasonable accommodation, can perform the essential functions of the [job]." 42 U.S.C. § 12111(8). By contrast, in order to secure social security disability benefits, an applicant must prove that he or she is disabled and unable to work. See 42 U.S.C. § 416(i). Thus, on the surface, it appears that a claim of inability to work is inconsistent with a claim of ability to perform the essential functions of a job.

Other circuits are divided on whether judicial estoppel should be adopted in this context. However, the circuits do not align themselves on either side of a neatly drawn line; rather, the varying approaches to the issue lie along a continuum. At one end of the continuum is McNemar v. Disney Store, Inc., 91

---

[1] We note that various district courts in this circuit have applied the doctrine of judicial estoppel in this context. See, e.g., Cline v. Western Horseman, Inc., 922 F. Supp. 442, 446-49 (D. Colo. 1996); Nguyen v. IBP, Inc., 905 F. Supp. 1471, 1484-85 (D. Kan. 1995).

F.3d 610, 618-20 (3d Cir. 1996), upon which U S West relies. The McNemar court held that a plaintiff with AIDS who claimed an inability to work for purposes of collecting disability benefits was estopped from arguing that he is a "qualified individual with a disability" under the ADA. However, a subsequent Third Circuit panel has noted that "McNemar has been the object of considerable criticism" because of its failure to take into consideration the differing purposes of the Social Security Act and the ADA. Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997).

One of the purposes of the Social Security Act is to provide income support to an individual who is unable to work, perhaps temporarily, because of a disabling condition. See 42 U.S.C. § 1381. One of the purposes of the ADA is to provide an opportunity for an individual to work in spite of a disabling condition, by requiring accommodation and by eliminating discrimination. See 42 U.S.C. § 12101(a)(8) ("[T]he Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]."); see also 42 U.S.C. § 12101(b)(1) ("It is the purpose of [the ADA] to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.") Thus, the ADA takes into consideration whether an individual with a disability can work *given reasonable accommodation*. See

15

42 U.S.C. § 12111(8) (emphasis added). The Social Security Act, on the other hand, does not take into consideration whether an accommodation would render the individual able to perform a job. Therefore, a statement that a person is disabled for purposes of obtaining social security disability benefits--a determination made without regard to accommodation--is not necessarily inconsistent with a statement that a person has been discriminated against in the workplace on the basis of her disability--a determination made only after giving due regard to accommodation.

Despite McNemar's shortcomings, at least one circuit has indicated a willingness to adopt the Third Circuit's approach, albeit not applying the doctrine of judicial estoppel per se. See Kennedy v. Applause, Inc., 90 F.3d 1477, 1481-82 (9th Cir. 1996) (holding, without applying the doctrine of judicial estoppel, that the plaintiff, who made sworn statements of total disability in a social security disability application and then testified at her deposition that she was not totally disabled, failed to raise a genuine issue of material fact as to whether she was a qualified individual with a disability within the meaning of the ADA); see also Simon v. Safelite Glass Corp., 128 F.3d 68, 74 (2d Cir. 1997) (applying judicial estoppel in an age discrimination case, but specifically stating that the applicability of judicial estoppel to ADA cases will be "left for another day").

16

Farther along the continuum lies the Fifth Circuit's pronouncement on this issue. In Cleveland v. Policy Management Systems Corp., 120 F.3d 513, 518 (5th Cir. 1997), the court held "that the application for or the receipt of social security disability benefits creates a *rebuttable* presumption that the claimant or recipient of such benefits is judicially estopped from asserting that he is a 'qualified individual with a disability.'" The court acknowledged, however, that a person may simultaneously be a person with a disability under the Social Security Act, and also a qualified individual with a disability under the ADA. Id. In such a case, the presumption would be rebutted. Id.

At the other end of the continuum from the Third Circuit's decision in McNemar is the D.C. Circuit's approach. In Swanks v. Washington Metropolitan Area Transit Authority, 116 F.3d 582, 587 (D.C. Cir. 1997), the D.C. Circuit pointed out McNemar's failure to address the differing purposes of the Social Security Act and the ADA. The Swanks court was faced with the issue of "whether appellant, alleging he was fired due to his disability, is barred from seeking relief under the Americans with Disabilities Act because he receives Social Security disability benefits." Id. at 583. The court, focusing on the fundamental differences between the Social Security Act and the ADA, stated "in assessing eligibility for disability benefits, the Social Security Administration gives no consideration to a claimant's ability to work with reasonable

17

accommodation." Id. at 584. The court held that "receipt of Social Security disability benefits does not preclude ADA relief." Id. at 583. A holding to the contrary "would force disabled individuals into an 'untenable' choice between receiving immediate subsistence benefits under the Social Security Act or pursuing discrimination remedies. Forcing such a choice would undermine the pro-employment and anti-discrimination purposes of the two statutes . . . . Nothing in either statute requires disabled individuals to make this choice." Id. at 586.

The D.C. Circuit was careful to point out that a claimant's statement in support of a social security disability claim may still be relevant in an ADA suit. Id. at 587. The court cited the example of a claimant who represents to the Social Security Administration that he or she is unable to perform the essential functions of a job even with reasonable accommodation. Id. Such an individual, the court stated, could well be barred from asserting a claim under the ADA. Id.

Besides the D.C. Circuit, several other circuits have rejected the doctrine of judicial estoppel in this context. See Johnson v. Oregon, No. 96-36191, 1998 WL 181297, at *4 (9th Cir. Apr. 20, 1998) ("[N]either application for nor receipt of disability benefits automatically bars a claimant from establishing that she is a qualified person with a disability under the ADA."); Griffith v. Wal-Mart Stores, Inc, 135 F.3d 376, 381 (6th Cir. 1998) ("'We agree with the D.C. Circuit's

18

opinion in [Swanks], that holds that the receipt of disability benefits does not preclude subsequent ADA relief and rejects the doctrine of judicial estoppel, but does allow the consideration of prior sworn statements by the parties as a material factor.'" (quoting Blanton v. Inco Alloys Int'l, Inc., 123 F.3d 916, 917 (6th Cir. 1997))); Talavera v. School Board of Palm Beach County, 129 F.3d 1214, 1220 (11th Cir. 1997) ("We agree with the majority of our sister circuits that a certification of total disability on an SSD benefits application is not inherently inconsistent with being a 'qualified individual with a disability' under the ADA."); Weigel v. Target Stores, 122 F.3d 461, 466 (7th Cir. 1997) ("the Social Security Administration's decision to grant disability benefits to [the plaintiff] is not determinative as to whether or not she may be considered a 'qualified individual' under the ADA").[2]

After considering the varying views of other circuits, we adhere to Parkinson, 233 F.2d at 432, 49.01 Acres of Land, 802 F.2d at 390, and Chrysler Credit Corp., 928 F.2d at 1520 n.10, which signaled our refusal to adopt the doctrine of judicial estoppel. We join the majority of circuits and hold that statements made in connection with an application for social security disability benefits cannot be an automatic bar to a disability discrimination claim under the

---

[2]The Eighth Circuit has declared that it has not yet "firmly entrenched itself within any of the camps of divergent opinions on this issue." Dush v. Appleton Elec. Co., 124 F.3d 957, 962 n.8 (8th Cir. 1997).

19

ADA. Such statements may, however, constitute evidence relevant to a determination of whether the plaintiff is a "qualified individual with a disability."

Because Mr. Rascon was on unpaid leave while he was in the Menlo Park program, he contacted the Social Security Administration for assistance with his financial difficulties. U S West argues that in connection with his application for disability benefits, Mr. Rascon stated that he did not plan ever to return to work. Regardless of what may have been Mr. Rascon's intentions at one time, there is no evidence that in connection with his application for disability benefits, Mr. Rascon indicated that he could not perform the essential functions of his job with reasonable accommodation. There is, however, evidence that he did, indeed, want to and expect to return to his job after completing the treatment program. Aplt's App. vol. II at 113. There is also testimony from Dr. Canive that Mr. Rascon would have been able to return to his job had U S West not terminated him. Aplt's App. vol. III at 250-51.

Mr. Rascon was committed to an intensive in-patient treatment program. U S West denied the accommodation that he requested--paid leave to participate in this program. Therefore, he sought income support via social security disability benefits. There is nothing inconsistent in Mr. Rascon applying for disability benefits after having his reasonable accommodation denied. See D'Aprile v. Fleet Servs. Corp., 92 F.3d 1, 5 (1st Cir. 1996) ("[The plaintiff's] contention, that

20

she was unable to work because her employer refused to permit a temporary part-time schedule, is entirely consistent with her claim to have been 'totally disabled' within the meaning of the [company's disability] policy"). In fact, U S West's company policy included a statement notifying employees of the option of applying for social security benefits during periods of disability. Aple's Supp. App. at 76.

Nothing in Mr. Rascon's application for disability benefits precludes a finding that he was a qualified individual with a disability within the meaning of the ADA. Moreover, this court has repeatedly refused to adopt the doctrine of judicial estoppel. Thus, we find no error in the district court's conclusion that statements Mr. Rascon made in his social security disability application do not bar relief under the ADA.

### B. Mr. Rascon established a prima facie case of disability discrimination.

In order to establish a prima facie case under the ADA, a plaintiff must prove: "(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir. 1995).

U S West argues that even if this court does not adopt judicial estoppel, the court should nonetheless find that Mr. Rascon failed to establish a prima facie case of disability discrimination as a matter of law. U S West contends that Mr. Rascon failed to establish the second element of his prima facie case--that he could perform the essential functions of his job--because his sworn statements in his social security application indicate that he could not work. This argument essentially rehashes U S West's judicial estoppel argument, which we have already rejected. We have considered the statements in Mr. Rascon's social security application which are relevant to his ADA claim, and we have found that they do not bar relief under the ADA. The fact that Mr. Rascon was unable to work and in need of financial assistance while he was receiving long-term care in Menlo Park simply does not preclude a finding that he is a qualified individual with a disability.

The district court found that Mr. Rascon was able to perform the essential functions of his job "with reasonable accommodation of his need for [posttraumatic stress disorder] counseling and treatment." Aplt's App. vol. I at 35. The question of whether Mr. Rascon was able to perform the essential functions of his job is a mixed question of law and fact involving primarily a factual inquiry. Thus, we review this finding for clear error. There are various pieces of evidence in the record that support such a finding. Dr. Canive, Mr.

22

Rascon's treating psychiatrist, noted that despite the treatment Mr. Rascon received at the Albuquerque VA, Mr. Rascon was still having significant difficulty controlling his symptoms. Nonetheless, Mr. Rascon was able to continue working at U S West. Dr. Canive opined that Mr. Rascon's ability to work in spite of severe posttraumatic stress disorder symptoms was due to his motivation and work ethic. Because of Mr. Rascon's continuing symptoms, Dr. Canive recommended long-term in-patient treatment for Mr. Rascon's condition. Upon completion of the treatment, Mr. Rascon's condition had improved. In Dr. Canive's opinion, Mr. Rascon could have returned to his job at U S West upon release from the Menlo Park program.

In addition to Dr. Canive's opinion, Dr. Finley's report indicated that Mr. Rascon's prognosis was good and that he could expect an improvement in his work life once he had completed treatment. While there is evidence in the record that Mr. Rascon was having emotional difficulties at work, U S West has not pointed to any evidence in the record which would tend to prove that Mr. Rascon could not perform the essential functions of a Network Technician. We cannot say that the district court erred in finding that Mr. Rascon was able to perform the essential functions of his job with reasonable accommodation. As to the other elements of a plaintiff's prima facie case, U S West does not raise an argument with respect to the first element, i.e. whether Mr. Rascon has a disability. As to

23

the third element, i.e. whether U S West discriminated against Mr. Rascon on the basis of his disability, we shall discuss that below.

### C.  Mr. Rascon's requested leave of absence was a reasonable accommodation.

The district court concluded that the leave of absence Mr. Rascon requested was a reasonable accommodation.  Aplt's App. vol. I at 41-42.  U S West argues that the district court erred in so concluding.  This is a mixed question of law and fact which primarily involves the consideration of legal principles.  Thus, we review the district court's conclusion de novo.

U S West frames the issue as whether *attendance* is an essential function of Mr. Rascon's job.  Aplt's Brief at 29.  That simply is not the relevant inquiry when a reasonable accommodation of disability *leave* is at issue.  Under these circumstances, the question of whether attendance is an essential function is equivalent to the question of what kind of leave policy the company has.  As we shall discuss, U S West's own policies offer various kinds of disability leave, both paid and unpaid.

"Under the ADA, prohibited discrimination includes failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996) (quoting 42 U.S.C. §

24

12112(b)(5)(A)).  An allowance of time for medical care or treatment may constitute a reasonable accommodation.  Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1169 (10th Cir. 1996).  However, an indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment.  Id.; see also Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (holding that "reasonable accommodation does not require the [employer] to wait indefinitely for [the plaintiff's] medical conditions to be corrected").  The Hudson court noted that "[e]xamples of possible accommodations include 'permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment.'"  Hudson, 87 F.3d at 1168 (quoting 29 C.F.R. Pt. 1630, Appendix to Part 1630--Interpretive Guidance to Title I of the ADA, § 1630.2(o)).  The plaintiff in Hudson failed to present evidence of the expected duration of her impairment, a course of treatment, or a prognosis; therefore, the court affirmed summary judgment in favor of the employer.

Hudson is distinguishable from the case at bar.  Before Mr. Rascon left for Menlo Park, he told Ms. Sullivan that the expected duration of his treatment was estimated at four months.  In early March, Dr. Truitt received a report from Dr. Finley indicating that Mr. Rascon needed approximately four months to complete the program.  In actuality, Mr. Rascon was a patient in the Menlo Park program

25

for a little less than five months. Furthermore, U S West was aware of the nature of Mr. Rascon's course of treatment, and U S West was aware of why Mr. Rascon was undergoing this treatment. Finally, the prognosis from Mr. Rascon's doctors was good. His doctors thought that the program was very likely to improve Mr. Rascon's work and home life by assisting him to cope with his posttraumatic stress disorder.

An employer need not make a reasonable accommodation that would cause "an undue hardship." Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1087 (10th Cir. 1997) (quoting 42 U.S.C. § 12112 (b)(5)(A)). "The employer . . . bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship." Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997). "Undue hardship" means "an action requiring significant difficulty or expense" when considered in light of various factors. 42 U.S.C. § 12111(10)(A). The factors to be considered in determining whether an accommodation would cause an employer undue hardship are, among others: the nature and cost of the accommodation; the number of persons employed by the company; the financial resources of the company; and the impact of the accommodation upon the operation of the company. 42 U.S.C. § 12111(10)(B). U S West contends that the leave which it did grant Mr. Rascon was an extraordinary accommodation and that it met with difficulties because other employees had to cover Mr. Rascon's

26

responsibilities. Although U S West characterizes the departmental leaves as "extraordinary," in actuality, these leaves of absence were less accommodating than company policy required, and the corresponding conditions U S West attached to the leaves of absence were more restrictive than company policy allowed.

When U S West granted Mr. Rascon back-to-back departmental leaves in increments of thirty days conditioned on receiving information from Mr. Rascon's doctors, it was not following its own policies. Under U S West's leave policy, an informal departmental leave of less than thirty days could have been granted by Ms. Sullivan alone without any approval from U S West's Health Benefits Committee. Aplt's App. vol. III at 368. Furthermore, a departmental leave does not require validation; that is, an employee is not required to give an explanation to U S West as to why he or she needs the leave. Aplt's App. vol. IV at 389.

When an employee requests more than thirty days' leave, as Mr. Rascon did, then more formal extended leave periods are available. U S West's Anticipated Disability Leave of Absence provided for up to six months of unpaid leave with guaranteed reinstatement. The employee must apply for this leave thirty days in advance; however, the policy provides that an employee may use vacation time while waiting on a pending application. The only validation required is that the

27

employee provide U S West a doctor's statement as proof of a "planned medical treatment." Aple's Supp. App. at 53.

Another option available under U S West's leave policy is a Personal Leave of Absence. This option provides for up to twelve months of leave. When requesting personal leave, an employee does not need to share with U S West the reasons for the leave. A personal leave comes with no compensation and no guarantee of reinstatement. Aple's Supp. App. at 60.

U S West also had in place, at the time that Mr. Rascon requested an accommodation of leave, a sickness and accident disability plan. Under this policy, because of Mr. Rascon's seniority with the company, U S West was required to pay Mr. Rascon's full salary for a period of thirty-nine weeks and fifty percent of his salary for an additional thirteen weeks. Id. at 72. In order to be eligible for this paid disability leave, Mr. Rascon was required to report his disability to his supervisor, place himself under a physician's care, follow the recommended treatment, and furnish satisfactory medical certification. Id. at 73.

Thus, Ms. Sullivan was not following U S West's generous leave policy when she informed Mr. Rascon that she could not grant him a departmental leave because he had not provided Health Services with the appropriate information. Ms. Sullivan clearly had the authority to grant a departmental leave on her own without any explanation from Mr. Rascon. Furthermore, aside from departmental

28

leave, there were various other more appropriate and accommodating options which Ms. Sullivan could have explored with Mr. Rascon, including paid disability benefits or an unpaid anticipated disability leave. Ms. Sullivan testified that the reason she did not explore alternatives was because Mr. Rascon did not request a particular kind of leave. Aplt's App. vol. III at 375. However, there is no dispute that Mr. Rascon stated to Ms. Sullivan that even if U S West denied paid disability leave, he wanted to attend the treatment program in Menlo Park. Mr. Rascon was determined to seek treatment even if it meant that U S West would not pay him during his absence. Any of the alternatives discussed above would have constituted a reasonable accommodation.

There was no evidence presented to the district court as to U S West's overall financial resources. Aplt's App. vol. I at 50. However, U S West is a global operation with 50,000 to 60,000 employees. Id. Furthermore, U S West did not replace Mr. Rascon while he was in Menlo Park, even when it claimed it could no longer grant departmental leaves that came with guaranteed reinstatement. Id. Under the circumstances, the fact that Mr. Rascon's duties were covered by co-workers while he was on leave does not establish that granting Mr. Rascon leave until he completed the treatment program would have caused U S West undue hardship. U S West failed to carry its burden of demonstrating that any of the alternative accommodations would have caused it

29

undue hardship. Thus, we conclude that leave to attend the Menlo Park treatment program was a reasonable accommodation.

**D. Mr. Rascon provided U S West with sufficient information regarding his disability.**

The question of whether Mr. Rascon provided U S West with sufficient information about his disability and its treatment is a question of fact, namely, what information did U S West require, according to its policy, in order to grant leave to an employee. Thus, we review the district court's determination for clear error. We have already discussed at length the course of events that took place in this case. Briefly, we reiterate that Mr. Rascon himself made contact with his supervisor, Ms. Sullivan, and with Ms. Truitt in Health Services before he left for Menlo Park. With both of them, he discussed in detail his disability and his need for treatment. When U S West denied paid disability leave, he asked Ms. Sullivan for an unpaid leave to attend the entire treatment program. Before he left for Menlo Park, Mr. Rascon signed two medical releases, one for Dr. Canive and one for Dr. Finley.

As we discussed above, in order to be eligible for paid disability leave, Mr. Rascon was required to report his disability to his supervisor, place himself under a physician's care, follow the recommended treatment, and furnish satisfactory medical certification to U S West. Both of Mr. Rascon's doctors, Dr. Canive and

30

Dr. Finley, provided U S West, at various times before and during Mr. Rascon's treatment in Menlo Park, information regarding Mr. Rascon's disability, his course of treatment, his prognosis, and the expected duration of his treatment. Although there is evidence that Mr. Rascon intended to revoke his medical release, he did not, in fact, do so.

Moreover, as we have discussed above, various leave options available under U S West's policy did not require an employee to share any information whatsoever with U S West. Another option, anticipated disability leave, required that the employee provide U S West with a doctor's statement as proof of a "planned medical treatment." Aple's Supp. App. at 53. The information provided by either Dr. Canive or Dr. Finley would appear to satisfy this condition. Considering the evidence adduced at trial, we cannot say that the district court's finding that Mr. Rascon provided U S West sufficient information concerning his disability and treatment was clearly erroneous.

### E. The district court did not err in awarding compensatory damages.

In a case of "unlawful intentional discrimination," a court may award the plaintiff compensatory damages. 42 U.S.C. § 1981a. A finding of intentional discrimination is a finding of fact, which we review for clear error. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). "We must give great

31

deference to the factual determinations of the original finder of fact, who has the exclusive ability to assess the demeanor and the tone of the witness' testimony." Thompson v. Rockwell Int'l Corp., 811 F.2d 1345, 1350 (10th Cir. 1987).

In ADA cases where a discriminatory practice involves the provision of a reasonable accommodation, compensatory damages may not be awarded where the employer "demonstrates good faith efforts, in consultation with the person with the disability who has informed the [employer] that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business." 42 U.S.C. § 1981a(a)(3). U S West claims that the district court erred in finding that it did not make a good faith effort to accommodate Mr. Rascon's disability.

U S West argues that it had accommodated Mr. Rascon's disability in the past, when it provided anger management counseling to Mr. Rascon and when it granted him leave to attend the out-patient treatment program in Albuquerque. However, what is at issue in this case is Mr. Rascon's request for an accommodation to attend an intensive treatment program for his disability when prior treatment proved ineffective. The district court did not err when it found a lack of good faith efforts on the part of U S West.

U S West claims that it would have granted Mr. Rascon unpaid departmental leave to attend the entire Menlo Park program had Mr. Rascon complied with its requests for additional information. However, we do not find clearly erroneous the district court's findings that Mr. Rascon provided U S West with minimally sufficient information regarding his disability and its treatment or that U S West failed to comply with its own disability and leave policies because validation and explanations were not even required for Ms. Sullivan to grant a departmental leave.

Taking all of this into consideration, the district court found that U S West's explanation as to why it did not grant Mr. Rascon leave--lack of information--was, in reality, a pretext for discrimination. Aplt's App. vol. I at 53. Thus, the court found that U S West intentionally discriminated against Mr. Rascon on the basis of his disability. Aplt's App. vol. I at 44. After having carefully examined the evidence before the district court, we are not left "'with the definite and firm conviction that a mistake has been committed'" in its finding of intentional discrimination. See Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

## III. CONCLUSION

In summary, the district court correctly refused to apply the doctrine of judicial estoppel. The district court did not err in concluding that Mr. Rascon established a prima facie case of discrimination under the ADA. We agree with the district court's legal conclusion that Mr. Rascon's requested accommodation, a leave of absence to attend the treatment program in Menlo Park, was reasonable and would not have caused U S West undue hardship. The court did not clearly err in finding that Mr. Rascon provided U S West sufficient information regarding his disability and its treatment, to the extent that information was even necessary, for U S West to grant Mr. Rascon either paid or unpaid leave. Neither did the court err in finding that U S West's stated reason for denying Mr. Rascon leave and for terminating him was a pretext for discrimination. Finally, the district court's award of compensatory damages for U S West's intentional discrimination was not clearly erroneous. Accordingly, we AFFIRM the judgment of the district court.