**UNITED STATES of America,**
**Plaintiff,**

v.

**THE CITY AND COUNTY OF DENVER; and the Denver Police Department, Defendants.**

**No. CIV. A. 96–K–370.**

United States District Court,
D. Colorado.

June 4, 1999.

Henry L. Solano, U.S. Attorney's Office, Denver, Joan A. Magagna, U.S. Department of Justice, Housing & Civil Enforcement Section, Eugenia Esch, U.S. Department of Justice, Washington, DC, for Plaintiff.

J. Wallace Wortham, Jr., Steven Woodrow Moore, City Attorney's Office, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON REMEDIAL ISSUES

KANE, Senior District Judge.

The United States sues the City and County of Denver ("the City") and the Denver Police Department ("the DPD") for declaratory and injunctive relief to enforce the provisions of Titles I and II of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, *et seq.,* and 42 U.S.C. § 12131, *et seq.,* and the implementing regulations. Jurisdiction exists under 42 U.S.C. §§ 12117(a), 2000e–6, 12133, and 28 U.S.C. § 1345. Before me is Defendants' Motion for Summary Judgment, which I deny.

### I. *Background.*

The United States asserts two different claims. The first is that Defendants' policy of prohibiting reassignment of police officers with disabilities to vacant jobs within the City's Career Service Personnel system for which they are qualified constitutes a "pattern or practice" of discrimination in violation of Title I of the American With Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.* This claim was bifurcated into a liability and a remedial stage for discovery and trial.

The liability phase concluded on October 10, 1996, when I granted the United States' Motion for Summary Judgment on Liability under Title I in Civil Action No. 96–K–370. *See United States v. City & County of Denver,* 943 F.Supp. 1304 (D.Colo.1996). On February 11, 1997, I entered an Order of Stage II Discovery Schedule for the remedial stage, during which the United States was to identify all individuals who have been injured as a result of Defendants' proven discriminatory "pattern or practice."

The second claim was on behalf of Jack L. Davoll under Title II of the ADA, 42 U.S.C. § 12131 *et seq.,* alleging that Defendants discriminated against Davoll by refusing to reassign him to a vacant Career Service position for which he was qualified, after he became unable to perform the essential functions of his police officer position due to his disability. The Title II claim was consolidated for trial with *Davoll et al. v. Webb,* Civil Action No. 93–K–2263, in which Davoll and two other former Denver police officers, Deborah Clair and Paul Escobedo alleged Defendants violated Title II of the ADA by denying them reassignment. These claims were tried and, on November 13, 1996, a jury rendered verdicts in favor of Davoll, Clair and Escobedo and awarded a total of $800,000 in compensatory damages. I later determined they were entitled to equitable relief. Defendants' appeal to the Tenth Circuit on that aspect of this case is pending.

In entering summary judgment for the United States on liability on its Title I "pattern or practice" claim, I found it had proved a prima facie case of liability by establishing each Defendant was a covered entity under Title I; Defendants' policy or practice barring the reassignment of officers with disabilities to vacant positions for which they were qualified was undisputed; and Defendants' policy or practice discriminated against "qualified individuals with disabilities" covered by Title I. *United States v. City & County of Denver,* 943 F.Supp. at 1309–13. At the liability stage of the "pattern and practice" suit, the government was not required to show individual discrimination regarding each person for whom it sought relief. It sufficed to show specific evidence of Defendants' discrimination regarding some of the employees that it sought to represent. *Id.,* at 1308.

The premise of the decision granting summary judgment on the liability aspect

of the Title I claim was that, although evidence that a particular person is a "qualified individual with a disability" was not necessary to show liability, it would be required to show that such person is among those individuals for whom relief may be sought. *Id.* at 1309. As the United States then argued, such issue is always resolved at the remedial stage of a bifurcated action. *Id.* (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 52 L.Ed.2d 396(1977)). Determination of whether an individual has a "disability" as defined in the ADA is an individualized inquiry. Questions of individual relief such as the employment status of an individual, rejection of his or her request for reassignment to vacant positions, and entitlement to relief were deferred until this, the remedial phase of the pattern and practice claim.

On April 15, 1998, the government filed its Report on Individual Relief, identifying thirteen officers as claimants, and maintaining each (1) has a physical or mental impairment that substantially limits one or more of his or her major life activities; (2) either requested reassignment as a reasonable accommodation, or did not do so because such request would be futile due to Defendants' "no reassignment policy; and (3) was qualified for an identified vacant position to which he or she could have been reassigned." The report requests the court to grant the claimants equitable relief, including back pay and job placement with retroactive seniority.[1] It explains their eligibility for relief and the method used to compute the monetary relief sought and seeks the placement of each claimant into the next vacancy for the position identified for that claimant as that closely resembling his or her police officer job in terms of status and pay.

Supported by voluminous attached records, the report specifies the physical or mental impairments of each claimant and the major life activity or activities substantially limited by those impairments. The report asserts each claimant was aware of Defendants' policy barring reassignment of police officers to Career Service vacancies within or outside the Denver Police Department. While most of the claimants did not request reassignment because they believed it would have been a futile gesture to do so, the report describes the steps taken by those who did request a transfer to non-patrol jobs. Referring to attached exhibits, the report identifies several Career Service vacancies for which each claimant was allegedly qualified either at the time he or she made known to Defendants his or her intention to obtain a medical retirement, or sought a service retirement.

On July 23, 1998, Defendants' Objections to the United States' Report on Individual Relief was filed, requesting that no relief be provided to any of the claimants identified by the United States. The objections are on substantially similar grounds to those raised in the motion for summary judgment. Defendants are unclear on the purpose of the report, correctly noting that no relief can be granted without a trial. On October 8, 1998 the United States filed a reply to the objections.

In their summary judgment briefs, the parties incorporate facts, arguments, and exhibits contained in their respective briefs relating to report. The report itself does not entitle the government to relief with-

---

1. For enforcement of Title I, Congress adopted the powers, remedies and procedures from Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. which prohibits discrimination in employment on the basis of race, color, religion, sex, and national origin. Title I of the ADA states:

 The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

 42 U.S.C. § 12117(a)

out a trial. Therefore, at this time, I do not rule on the issues raised in relation to the report, save insofar as they are encompassed by those raised in the summary judgment briefs.

## II. *Motion for Summary Judgment*

On May 15, 1998, Defendants filed a motion for summary judgment, arguing an examination of the circumstances surrounding each claimant's separation from employment with the DPD reveals the United States cannot establish any claimant is entitled to relief under the ADA. Defendants claim the government cannot show, with regard to each claimant, the elements of a prima facie case under the ADA, namely that each (a) has "a physical or mental impairment that substantially limits one or more of [his] or [her] major life activities," 42 U.S.C. § 12102(2)(A), (b) is "a qualified individual with a disability," and (c) was terminated on account of his or her disability.[2] Defendants also maintain, pursuant to the Tenth Circuit's holding in *Smith v. Midland Brake, Inc.,* 138 F.3d 1304, 1305 (10th Cir.1998), *reh'g en banc granted,* May 5, 1998, under the ADA, when an employee is not qualified, with or without reasonable accommodation for the job which he or she currently holds or from which he or she was terminated, the employer has no obligation to consider reassigning him or her to another position. Defendants further argue there are "lawful reasons" why the claimants would not have

been transferred even if the no-reassignment policy in question did not exist. They object to the United States' use of hearsay in support of the claims and to the manner of computation of back pay. In addition, Defendants make specific objections regarding each claimant.

## III. *Standards for Summary Judgment.*

"Summary judgment is appropriate if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Hagelin for President Committee v. Graves,* 25 F.3d 956, 959 (10th Cir.1994)(quoting Rule 56(c)). "In applying this standard, we construe the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Blue Circle Cement, Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1503 (10th Cir.1994). "'The moving party carries the burden of showing beyond a reasonable doubt that it is entitled to judgment . . . .'" *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993)(quoting *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1437 (10th Cir.1987)). "Rule 56, however, imposes no requirement on the moving party to 'support its motion with affidavits or other similar material *negating* the opponents' claim." *John Hancock Mut. Life Ins. Co. v. Weisman,* 27 F.3d 500, 503 (10th Cir.1994) (quoting *Celotex Corp. v.*

---

**2.** The term "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

The term "major life activity" as defined in the regulations implementing the ADA encompasses "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i) (1998). The appendix to the regulations provides that "other major life activities include, but are not limited to, sitting, standing, lifting, reaching." 29 C.F.R. Pt. 1630, Appendix to Part 1630—Interpretive Guidance to Title I of the ADA, § 1630.2(i) (1998).

The term "substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (1998). The three factors to be considered when determining whether an impairment substantially limits a major life activity are "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"Once the moving party shows its entitled to summary judgment, the burden shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir.1993)(quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990)), *cert. denied,* 510 U.S. 1120, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994). "[T]he nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying on the types of evidentiary materials contemplated by Rule 56." *John Hancock,* 27 F.3d at 503.

"To be a 'genuine' factual dispute, there must be more than a mere scintilla of evidence. To avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative." *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir.1993)(citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Bingaman v. Kansas City Power & Light Co.,* 1 F.3d 976, 980 (10th Cir.1993)(quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505).

### IV. *Merits.*

In this remedial phase of the case, the United States must demonstrate by way of admissible evidence, the elements of a prima facie case under the ADA. Relying on *White v. York International Corporation,* 45 F.3d 357, 360–61 (10th Cir.1995), Defendants assert the essential elements of a prima facie case are that each claimant (1) is a disabled person within the meaning of the ADA; (2) is qualified, *i.e.,* with or without reasonable accommodation he or she is able to perform the essential functions of the job; and (3) was terminated by the employer because of his or her disability. While Defendants maintain there is a lack of any admissible evidence to support a prima facie case on the part of any of the thirteen claimants, the United States asserts termination is not an essential element and the record clearly establishes the prima facie elements necessary for each or, at minimum, that genuine issues of material fact remain. I discuss the requirements for establishing a prima facie case under the ADA, before stating the relevant facts and assessing Defendants' contentions with regard to each claimant.

### A. *Termination as an Essential Element of the Prima Facie Case.*

The government disputes termination as a necessary element of the prima facie case. It cites *Siemon v. AT&T Corporation,* 117 F.3d 1173 (10th Cir.1997), requiring for the third element a showing that the employer discriminated against (not necessarily terminated) the individual because of the disability. *See also Butler v. City of Prairie Village,* 172 F.3d 736, 748 (10th Cir.1999). The United States also cites the jury instructions which I gave in the trial of the Title II claim (consolidated with *Davoll v. City & County of Denver* Civ.A. No. 93–K–2263), which did not require a showing of termination. In their reply, Defendants concede termination is not always a necessary element but assert they raised it as such because the primary relief sought on behalf of each claimant is back pay and, in the case of three claimants, reinstatement. According to Defendants, if claimants were not terminated, whether by actual or constructive discharge, there is no case or controversy and the case is moot. Alternatively, should the court find such controversy still exists, Defendants seek partial summary judgment, denying any back pay relief or reinstatement to any claimant.

Under 42 U.S.C. § 2000e *et seq.*, the courts have equitable power to make persons whole for injuries suffered on account of unlawful employment discrimination, including reïnstatement and back pay. *Griffith v. State of Colorado Div'sn of Youth Servs.*, 17 F.3d 1323, 1327 (10th Cir.1994). Defendants cite the holding in *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342–43 (10th Cir.1986), that remedies of back pay and reinstatement are not available in a discriminatory employment case unless the employee was constructively discharged, i.e. unless a reasonable person would have viewed the working conditions as intolerable. Applying this test, the United States would not be entitled to recover back pay on behalf of each claimant unless a reasonable person in each claimant's position would have felt compelled to resign under the circumstances. *See Hirschfeld v. New Mexico Dep't of Corrections*, 916 F.2d 572, 580 (10th Cir. 1990). The Tenth Circuit has repeatedly "recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired." *Burks v. Oklahoma Publishing Co.*, 81 F.3d 975, 978 (10th Cir. 1996). As discussed below, genuine issues of fact exist as to whether Defendants' non-reassignment policy left each claimant with no other choice but to quit.

An alternative approach, is that "constructive discharge" is inapplicable in this ADA analysis, as illustrated in *Cooper v. Neiman Marcus Group*, 125 F.3d 786 (9th Cir.1997), (*en banc*):

> [Plaintiff] did not elect to resign in order to receive a benefit package any more than she resigned because working conditions were intolerable. To the contrary, [Plaintiff] was effectively discharged by her employer because it concluded that she was unable to speak in the manner it considered necessary for the proper performance of her job.

*Id.* at 792. From this perspective, material issues of disputed fact exist as to whether each of the thirteen claimants was effectively discharged because he or she could not perform the essential functions of the job as police officer and there was no possibility of reassignment under the City's policy. Because I conclude such issues of fact remain, I deny Defendants' motion insofar as it seeks summary judgment on the issue of back pay and do not reach the related mootness argument.

**B.** *No Expert Evidence to Show Each Claimant's Condition Substantially Limits a Major Life Activity.*

Defendants argue, because the government has not introduced any expert testimony that any claimant has a condition which substantially limits a major life activity, it cannot satisfy the first element of a prima facie case, namely that each claimant has a physical or mental impairment that substantially limits one or more of his or her major life activities. Defendants cite *Welsh v. City of Tulsa*, 977 F.2d 1415 (10th Cir.1992), where the plaintiff argued he was perceived as having an impairment that substantially limited his ability to work in one job as a firefighter. The *Welsh* court, however, listed the absence of a vocational expert's opinion as only one of several factors supporting its finding that plaintiff had presented only speculation in support of this contention. Similarly, Defendants' reliance on *Diaz v. U.S. Postal Service*, 658 F.Supp. 484, 489 (E.D.Cal. 1987) is unpersuasive. There, the court considered the absence of medical testimony of any kind attesting to the plaintiff's back problems as one factor in its finding that his impairment was not one which substantially limited one or more of his life activities.

Under Federal Rules of Evidence, Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto, in the form of an opinion or otherwise." The government argues expert medical testimony is not required to establish disability under the ADA, citing *Katz v. City of Metal Co., Inc.*, where the court held: "There is certainly no general rule that

medical testimony is always necessary to establish disability," 87 F.3d 26, 32 (1st Cir.1996). The United States also asserts this court has already implicitly found such testimony unnecessary in that no expert testimony was presented on behalf of the three former officers in the earlier adjudicated Title II claim consolidated for trial with *Davoll v. Webb.* Defendants concede there may be circumstances in which a disability is obvious, e.g., the loss of an arm, but argue this is not the case with the thirteen claimants, whose alleged disabilities require a medical explanation that a lay person cannot provide.

 As stated in *Katz,* however, no rule exists that medical evidence is always necessary to show that an impairment substantially limits a claimant's ability to work. As discussed below, the government has produced in relation to each claimant a sworn affidavit and/or deposition testimony as evidence of his or her alleged physical impairments. At minimum, this evidence raises a genuine issue as to whether each claimant's alleged physical impairment(s) substantially limit(s) one or more major life activities.

### C. *Qualified Individual with a Disability.*

Defendants argue the United States cannot show each claimant meets the requirement that he or she is a "qualified individual with a disability" within the meaning of the ADA, *i.e.,* "who with or without reasonable accommodation, could perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8). Acknowledging this court has found a duty to reassign to a vacant position exists, Defendants nevertheless argue there was no duty to accommodate each claimant because no claimant performed the initial duty to inform the employer of his or her disability before any ADA liability could be triggered for failure to provide accommodations. *See Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996) ("Under the ADA, prohibited discrimination includes failure to make

'reasonable accommodations' to the known physical or mental limitations of an otherwise qualified individual with a disability"). Defendants contend the government has failed to come forward with any evidence establishing an issue of material fact that Defendants knew of the alleged disabilities of the claimants but failed to accommodate them.

The United States cites the jury instructions in the consolidated trial of the Title II claim in this case, which charged an employee "is not required to request reassignment or transfer if he or she is aware that an employer has a policy of not providing that form of reasonable accommodation," (Instruction No. 17), and required for liability a finding that each plaintiff "asked to be reassigned, or, but for his or her knowledge of the employer's 'no-reassignment' policy, would have asked to be reassigned," (Instruction No. 20).

The ADA's implementing regulations pertinently state:

> Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of a qualified individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware. If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed. . . . The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability.

29 C.F.R. § 1630.9, App. (1998).

] Thus, if an employee requests accommodation or an employer knows of a disability of a qualified individual, the employer has the obligation to participate in

the interactive process of determining an accommodation. Stated otherwise: "An employer knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need only know the underlying facts, not the legal significance of those facts." *Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 997 (D.Or.1994). Accordingly, whether a defendant knows that a physical impairment is considered a disability is of no consequence. It suffices if the defendant knows the physical impairment exists.

Recently, the Equal Employment Opportunity Commission (EEOC) published *EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, EEOC Notice Number 915.002, March 1, 1999 (*"EEOC Guidance"*). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A reasonable interpretation of a statute by the agency charged to administer it is entitled to deference and should only be rejected if it is contrary to clear congressional intent or frustrates the policy Congress sought to implement. *Trustees of California State University v. Riley*, 74 F.3d 960, 963–64 (9th Cir.1996). Although the EEOC guidelines are "not controlling upon the courts by reason of their authority," they "do constitute a body of experience and informed judgment to which the courts and litigants may properly resort for guidance." *Aka v. Washington Hosp., Center*, 156 F.3d 1284, 1301 (D.C.Cir.1998) (*quoting Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

The recent guidelines state: "An employer may not assert that it never received a request for reasonable accommodation, as a defense to a claim for failure to provide reasonable accommodation, if it actively discouraged an individual from making such a request." *EEOC Guidance* at 51 n. 100. As discussed below with regard to each claimant, at minimum, a dispute of fact exists concerning whether the DPD knew each had an impairment which resulted in his or her being unable to perform the essential functions of the job of police officer. Thus, a material issue of disputed fact exists as to whether Defendants were obligated to engage in the interactive process of determining an accommodation, including considering the option of reassignment to a vacant position. Alternatively, Defendants' express "no-reassignment" policy may have actively discouraged claimants from making a knowingly futile request for reassignment, precluding Defendants from raising the failure to make such request as a defense.

## D. Smith v. Midland Brake

Defendants argue, under *Smith v. Midland Brake*, 138 F.3d 1304, 1308 (10th Cir.1998), *reh'g en banc granted*, May 5, 1998, the law of the Tenth Circuit is that none of the claimants is a qualified individual with a disability because none could, with or without reasonable accommodation, perform the essential functions of the job which he or she currently holds or from which he or she was terminated. As the decision in *Midland Brake* is being reheard *en banc*, I decline to consider this argument, save to note the EEOC guidelines disagrees with it. *See EEOC Guidance* at 37, n. 73 (citing with approval the decision in *Aka v. Washington Hosp., Ctr.*, 156 F.3d 1284, 1301 (D.C.Cir.1998) (finding the reasoning of the panel opinion in *Midland Brake* unpersuasive)). The guidance also cites with approval this court's earlier decision in *United States v. Denver*, 943 F.Supp. at 1311–13, which, in any event, constitutes the law of the case in this regard. *See EEOC Guidance* at 41, n. 81.

### E. *Vacant Positions.*

Defendants argue they are not liable under the ADA because there is no evidence in the record of any vacant Career Service positions available to claimants and thus there is no showing that they could have been reassigned to such positions. In these circumstances, Defendants assert, even if the no-reassignment to Career Service positions policy had not existed, there was no duty to reassign. What constitutes a "vacant position" is not defined within the ADA itself, although the EEOC recently explained its meaning as

the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time. A "reasonable amount of time" should be determined on a case-by-case basis considering relevant facts, such as whether the employer, based on experience, can anticipate that an appropriate position will become vacant within a short period of time. A position is considered vacant even if an employer has posted a notice or announcement seeking applications for that position. The employer does not have to bump an employee from a job in order to create a vacancy; nor does it have to create a new position.

*EEOC Guidance* at 39 (footnotes omitted).

Defendants acknowledge the Jobs Open bulletins list vacant positions within the Career Service System but maintain they include announcements for positions that are not vacant but are listed by the Career Service Authority from time to time to recruit for positions that are difficult to fill on short notice. There is no evidence, Defendants argue, to show the postings identified by claimants ever materialized into positions in that requisitions for such positions could have been abolished before the positions identified in the job bulletins ever materialized.

The United States contends Defendants' own witnesses described positions listed in the Jobs Open Bulletin as vacant. It cites the deposition testimony of Betsy Watts, Personnel Director of the City of Denver, concerning the procedure used in listing vacant positions and that of A. Fred Timmerman, the Director of the Career Services Authority, to the effect that the jobs represented in the "Jobs Open" bulletin were actual vacant positions. It also cites the deposition testimony of Stephen Atkinson, Recruiting and Examining Supervisor for the Career Service Authority, stating the Jobs Open bulletins are official publications and the primary instrument by which the Career Service lists and notifies the public of the positions for which it is actively recruiting.

In *Woodman v. Runyon,* the court stated: "The relevant inquiry...is whether the employee has provided evidence that he can be reasonably accommodated—which includes reassignment—sufficient to require submission to the jury." 132 F.3d 1330, 1340 (10th Cir.1997). There, a federal employee brought an action against the United States Postal Service under the Rehabilitation Act. The Tenth Circuit noted federal employers are far better placed than employees to investigate in good faith the availability of vacant positions and, to comply with the spirit of the Rehabilitation Act, an agency must offer to reassign the disabled individual to a funded vacant position unless the agency can demonstrate hardship. *Id.* at 1344. It reviewed the approaches of other circuits and adopted that of the Second Circuit concerning the burden of persuasion and production:

A plaintiff bears the ultimate burden of proving she is "qualified" within the meaning of the Act. However, a plaintiff's burden with respect to the plausibility of reasonable accommodation is one of production only,...,and this "is not a heavy one." It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has made this facial showing that accommodation is possible, the burden shifts to the defendant to prove that accommodating

the plaintiff would prove undue hardship.

*Id.* at 1344. The EEOC adopts a similar stance: "The employer is in the best position to know which jobs are vacant or will become vacant within a reasonable period of time." EEOC Guidance at 42–43 (footnote with citations omitted).

The United States has suggested with respect to each claimant the existence of a vacant position to which he or she could have been reassigned, thus satisfying the burden in *Woodman.* At minimum disputed issues of fact remain for trial as to whether these or other vacant positions existed at any relevant time.

### F. *Qualifications.*

Defendants assert Plaintiff has not come forward with any admissible evidence that the claimants were qualified for the positions identified, citing *White v. York International Corporation,* 45 F.3d 357 (10th Cir.1995) and *Carrozza v. Howard County, M.D.,* 847 F.Supp. 365, 368 (D.Md.1994), *aff'd,* 45 F.3d 425 (4th Cir.1995). Those courts granted summary judgment, finding the plaintiff's claims that the employer could reasonably accommodate them were conclusory. In *White,* the court found plaintiff "offered no evidence. Instead, he simply continued to assert the bald conclusion that with 'reasonable accommodation' he could have performed the 'essential functions' of the jobs at issue." *White* at 363. *Carrozza* held the plaintiff's assertions that "she could have performed the job with certain accommodations were insufficient to generate a triable issue of fact." *Carrozza* at 368.

The government argues the record shows all officers were presumptively qualified to perform certain Career Service jobs. In this regard, it cites the testimony of Lieutenant Steven Cooper, head of the personnel bureau of the DPD, in the consolidated trial of the Title II claim. The lieutenant stated, in the past, officers had performed many assignments within the DPD not directly related to patrol work, such as working as dispatchers or as evidence clerks in the property bureau. (Tr. at 720–1.) Through the process of "civilianization," many of these jobs were converted from the police officer as a sworn officer position into Career Service positions. (*Id.* at 720–21.) The essential functions of each of these positions were consistent with when the position was held by a sworn officer except that they did not require the ability to make an arrest or fire a weapon. (*Id.* at 721.) The government also cites the trial testimony of David L. Michaud, Chief of the Police for the City and County of Denver, to the effect that the majority of the Career Service positions in the Property Bureau used to be manned by commissioned police officers and had since been civilianized. (*Id.* at 864.) Further, in replying to Defendants' objections, the United States elucidates each claimant's qualifications for the job to which it contends he or she should have been reassigned. (Reply Defs.' Objections Report Individual Relief, Ex. D, Decl. Deborah Wolmark.)

■ This case is thus distinguishable from *White* and *Carrozza,* where the plaintiffs relied solely on their subjective bald conclusions that with reasonable accommodation they could have performed the essential functions of the jobs at issue. Here, the record goes beyond claimants' subjective opinions of their capabilities and generates a triable issue of fact as to whether the claimants were presumptively qualified for the positions to which the United States contends they should have been assigned.

Defendants offer the alternative argument that the United States has failed to present any evidence to rebut the argument that claimants could not have been reassigned because there is no evidence that they were more qualified than the individuals who ultimately obtained the posted, vacant positions. I rejected Defendants' proposed jury instruction to this effect in the trial of the Title II claim, noting the ADA permits only one defense in a reasonable accommodation cases,

namely undue hardship. Moreover, as the EEOC has noted, interpreting reassignment as simply an opportunity to compete for a vacant position "nullifies the clear statutory language stating that reassignment is a form of reasonable accommodation. Even without the ADA, an employee with a disability may have the right to compete for a vacant position." *See EEOC Guidance* at 44, n. 87 (*citing Wood v. County of Alameda,* 5 AD Cas. (BNA) 173, 184, 1995 WL 705139 (N.D.Cal.1995) (finding when employee could no longer perform job because of disability, she was entitled to reassignment to a vacant position, not simply an opportunity to "compete"); *Aka v. Washington Hosp. Center,* 156 F.3d at 1304–05 (finding that interpreting a reassignment provision as mandating nothing more than the employer allowing the disabled employee to submit his application along with all of the other candidates would render the provision a nullity); *United States v. Denver,* 943 F.Supp. at 1310–1311 (holding the ADA requires employers to move beyond traditional analysis and consider reassignment as a method of enabling a disabled worker to do a job)); *see also Ransom v. Arizona Bd. of Regents,* 983 F.Supp. 895, 902 (D.Ariz.1997) (noting "[a]llowing the plaintiff to compete for jobs open to the public is no accommodation at all").

### G. *Can the United States establish a prima facie case for each claimant?*

■ To establish each claimant has a prima facie case of discrimination under the ADA, the United States must show the claimant (1) is 'disabled' within the meaning of the ADA, (2) is qualified—with or without reasonable accommodation; and (3) was discriminated against because of his or her disability. *See Butler v. City of Prairie Village,* 172 F.3d at 748, *Siemon v. AT&T Corp.,* 117 F.3d at 1175. Defendants argue the United States cannot meet its burden of coming forward with admissible evidence to show each claimant is a qualified individual with a disability or was denied a reasonable accommodation and forced to retire. To the extent I have not addressed this argument with reference to all claimants, I now consider it in light of the record relating to each claimant

#### 1. *Jackson Bender*

Jackson Bender joined the DPD in February 1972 and was employed as a patrol officer until June 1993. He was in an accident involving his police motorcycle and a truck in 1977 and an off-duty automobile accident in July 1990. He was on active duty from January 1991 through June 1993 when he retired. Defendants argue Bender is not disabled within the meaning of the ADA in that he does not have a physical impairment that substantially limits one or more of his major life activities. According to Bender's testimony and affidavit, after his 1990 accident, he was in pain and making arrests, even with the help of fellow officers was difficult. On days when the pain became unbearable, he would request to be assigned to the Denver International Airport because the work there was less strenuous. At the time of his retirement, Bender could not on his own make a forcible arrest of an individual of his size or larger.

The government attaches the reports of Drs. Greenberg and Douthit, doctors of the Fire and Police Protection Association (FPPA), concluding that Bender could not perform the critical physical demands of police work. Defendants object to these reports as hearsay, arguing Federal Rules of Civil Procedure, Rule 56(e) stipulates for medical records to be admissible in the context of a response to a summary judgment motion, they should have an affidavit attached which properly authenticates the exhibit and which meets the requirements of the rule. *See Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980) (on motion for summary judgment, district court properly did not consider 17 pages of medical records that were attached to affidavit but not certified as required by Fed. R.Civ.P. 56(e)).

As discussed above, it is not necessary to produce medical evidence to establish a

plaintiff has an impairment which substantially limits a major life activity. Bender testified in deposition and states in an affidavit that he could not walk for more than a block, stand for more than 30 minutes, sit for more than 30 minutes, run or jog for more than a few steps without hip pain, reach under his left arm with his right, sleep without discomfort or lift more than a "couple of items." The affidavit and deposition testimony of Bender constitute admissible evidence which, even without reference to the medical records submitted, demonstrates the existence of a genuine issue of material fact as to whether he was substantially limited in the major life activities of walking, sitting and standing.[3]

Defendants further argue Bender cannot be a person with a disability because he is a farmer who performs "laborious" tasks. According to Bender's affidavit, however, his farm work requires him only to sit on a tractor for limited periods of time at a stretch and that, although he manages farm operations, the heavy physical tasks associated with farming are performed by either contractors or family members,

In addition, Defendants assert Bender is not a qualified individual with a disability in that he did not request a transfer to any other position nor any other form of reasonable accommodation. Bender testified when he notified his DPD personnel officer of his intention to apply for a medical disability retirement, the officer did not advise him to seek reassignment nor did Bender request such assignment as he was aware of the DPD's no reassignment policy. A reasonable jury could find DPD's "no-reassignment" policy actively discouraged Bender from making a knowingly futile request for reassignment thus precluding Defendants from raising the absence of such request as a defense. In addition, the evidence presents a sufficient disagreement to require submission to the jury as to whether the DPD knew Bender had an impairment which resulted in his being unable to perform the essential functions of the job of police officer which obligated it to engage in the interactive process of determining an accommodation, including the possibility of reassignment to a vacant position.

### 2. John E. Cain

John Cain was employed by the DPD as a police officer from May, 1965 until his retirement in July, 1996. While on duty he was involved in an automobile accident and injured his head, neck and shoulders, resulting, *inter alia*, in hearing loss in both ears. Defendants argue Cain's hearing impairment does not rise to the level of being a disability under the ADA because he testified in deposition that the use of hearing aids substantially improved his hearing problem and because he refused to wear his hearing aids when requested to do so by his commander. In this regard, they cite the holding in *Sutton v. United Air Lines* that the "determination of whether an individual's impairment substantially limits a major life activity should take into consideration mitigating or corrective measures utilized by the individual." 130 F.3d 893, 902 (10th Cir.1997). The government argues *Sutton* is distinguishable in that there the corrective de-

---

3. An additional argument raised by Defendants is that the claimants' affidavits are replete with hearsay, including comments and reports or records from physicians. In finding that there is a genuine issue for trial as to whether claimants were disabled within the meaning of the ADA, I do not rely on the medical records or references thereto in claimants' affidavits. I note however the Supreme Court's remarks in the leading case of *Celotex Corp. v. Catrett:* "We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e)· permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

vice at issue, contact lenses, fully restored the plaintiff's ability to see whereas Cain's hearing aids do not fully restore hearing and he did not have hearing aids when he was employed by the DPD. Again, without reference to the medical records submitted, Cain's affidavit and deposition testimony establish a genuine issue for trial as to whether his hearing impairment rises to the level of being a disability under the ADA and the extent to which wearing hearing aids would have reduced the severity of the impairment.

According to the record, in February 1994, Cain applied for the Career Service vacancy of Support Service Administrator (911 Communication) but that the position was abolished before any appointment was made. He also proposed the creation of and his appointment to the position of a civilian supervisor of dispatchers in the Communication Section, involving duties similar to those he was performing but in a controlled environment. Although no action was taken in this regard during his employment, soon after his retirement Defendants implemented his suggestion and created the job. Defendants correctly point out that there is no duty to reassign an employee to a position that must be created. However, the evidence shows a genuine factual dispute as to whether the DPD knew Cain had a hearing impairment which obligated it to engage in the interactive process of determining a reasonable accommodation, including reassigning him to a vacant position.

### 3. Bruce Chesy

Claimant Chesy joined the DPD in 1967 and was employed until January 1994 when he applied for retirement. He suffered injuries to his back while on duty as a police officer in 1976, 1980 and 1987. Defendants' position is that, at the time of his employment with DPD, Chesy did not have a disability within the meaning of the ADA because his impairment did not substantially limit a major life activity in that he was still able to walk, sit, and stand as done by the average person and his limitations, if any, were not severe. Citing Chesy's affidavit and deposition testimony, the government asserts, as a result of his back injuries and while at the DPD, Chesy was substantially limited in sitting, standing, walking, running and the activities of daily living. Construing the factual record and reasonable inferences therefrom in the light most favorable to the government, there is a genuine issue for trial as to whether Chesy was disabled within the meaning of the ADA at the time of his retirement.

Defendants further argue Chesy was not a qualified individual with a disability because he did not request a reasonable accommodation because of his medical condition. In this regard, the record shows in about January 1994 Chesy asked Chief Leary if he could be transferred to a less physically demanding patrol position at the airport, referring to general health concerns, but did not request reassignment to a Career Service vacancy because he did not think the possibility existed. A reasonable jury could find DPD's "no-reassignment" policy actively discouraged Chesy from making a knowingly futile request for reassignment thus precluding Defendants from raising the absence of such request as a defense. Moreover, the evidence presents a sufficient disagreement to require submission to the jury as to whether the DPD knew Chesy had an impairment which resulted in his being unable to perform the essential functions of the job of police officer, obligating it to engage in the interactive process of determining an accommodation.

Defendants also raise the argument that Chesy could not have been reasonably accommodated because, per his testimony, he did not look for work for 18 to 24 months following his retirement because of surgery and that it would be an undue hardship for the City to allow such a long leave of absence. The government does not respond to this contention. However, the record reflects Chesy retired in 1994 and the surgery was in 1995. As I have stated, the ADA requires employers to

move beyond traditional analysis and consider reassignment as a method of enabling a disabled worker to do a job. *United States v. Denver,* 943 F.Supp. at 1310–1311. In his affidavit, Chesy states, because he had no option for alternative employment within the confines of the City and of the DPD, he decided the only option was to retire. It does not necessarily follow from the fact that he did not initiate a job search in the period stated that he would not have been able to take up a different position within or outside of the DPD during that period had he been offered a reasonable accommodation. The record reflects a genuine issue for trial in this regard.

### 4. *Gregory M. Cross*

Gregory Cross joined the DPD in 1968 and was employed until January, 1997 when he retired, his last assignment and rank being that of detective. Defendants argue Cross' impairments at the time of his employment with DPD did not substantially limit a major life activity. According to Cross' affidavit, at the time of his retirement he had impairments of significant hearing loss and an injured left leg that had been operated on five times, which limited him in several major life activity. Although Defendants dispute the extent of Cross' impairments and their effects on any major life activities, the evidence is such that a reasonable jury could find' to the contrary.

Additionally, Defendants claim Cross did not request reasonable accommodation and is therefor not a qualified individual with a disability. The testimony of Cross is, before he decided to retire, he did not ask anyone within the DPD whether he could be reassigned to any other position within the police department because he knew such position did not exist, and in his 28 years of tenure there had been no allowance for a transfer or reassignment of injured officers. There is a genuine issue for trial as to whether DPD's "no-reassignment" policy actively discouraged Cross from making a knowingly futile request for reassignment, precluding Defendants from raising the defense of the absence of such request.

### 5. *Ernest Espinosa*

Ernest Espinosa testified in deposition that in 1965 he had a part-time job with the City assisting mechanics in the Highway Shops Department. He then went to the Denver Police Academy but worked for the Denver Park Police, a Career Service department, through July 1973 when he joined the DPD as a patrol officer until his termination in 1994. After November 1993, he was assigned to the medical unit, a light duty assignment. The record reflects between June 1993 and April 1994, he was assigned to limited duty because of medical restrictions. The government asserts Espinosa's disability is related to chronic anxiety, depression and nerve injury to his left arm and hand.

Defendants do not deny Espinosa was disabled within the meaning of the ADA but maintain they could not have reasonably accommodated him by reassignment to a Career Service position as he admitted in his deposition that during the time before he retired he was in no condition to work any job. The government relies on *Rascon v. U S West Communications, Inc.,* 143 F.3d 1324 (10th Cir.1998) where the employer contended the plaintiff could not be a qualified individual with a disability under the ADA because in his application for social security benefits he claimed he was totally disabled and unable to work. The court held such statements in connection with an application for social security benefits cannot be an automatic bar to a claim of disability. *Id.* at 1332. Recently, the Supreme Court upheld this view, adding that, when faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. *Cleveland v. Policy Management Systems Corp.,* —— U.S. ——, 119 S.Ct. 1597, 1603, —— L.Ed.2d —— (1999).

Defendants distinguish that situation from the instant circumstances where Espinosa's deposition testimony is that he was not in a condition to do any job. Espinosa explained it was during the time that he was being treated by doctors that he was in no condition to work any job. He also stated there were Career Service jobs he was qualified to do at the time of his retirement but was unaware he could request reassignment to those jobs. While Espinosa's testimony is relevant to a determination as to whether he was a qualified individual under the ADA, it is not determinative of this issue. A reasonable juror could conclude Espinosa, had he been reassigned, could have performed the essential functions of a lower graded position. *See* 29 C.F.R. pt. 1630, app. § 1630.2(*o*) (1998). In addition, there is a genuine issue for trial as to whether DPD knew, even well before his retirement, that Espinosa had an impairment which resulted in his being unable to perform the essential functions of the job of police officer, obligating it to engage in the interactive process of determining an accommodation.

Espinosa was dismissed from employment on April 18, 1994 for violation of several DPD rules and regulations including departing from the truth, disobedience of an order, punctuality, order to report, and feigning illness or injury. Defendants argue there is no evidence supporting an argument that Espinosa was dismissed on account of his disability. As stated, termination on account of a disability is not necessarily an element of a prima facie case under the ADA. Thus, I need not reach the issue of whether Espinosa was terminated for reasons other than his disability. In any event, a reasonable jury could find, as argued by the government, that the violations leading to Espinosa's dismissal were attributable to his disability.

### 6. *Dennis W. Griffith*

Dennis Griffith joined the DPD in March, 1978 and was employed until his disability retirement in July, 1997. His last rank was that of detective. During his employment with the DPD, he was involved in two serious patrol car accidents and in several physical altercations with suspects. According to his affidavit, as a result of these incidents, he injured his neck, shoulder and back and had to have several surgeries and be under almost continuous care of several doctors for the past 15 years, having been diagnosed with degenerative disc disease in his lower back and neck and shoulder impingement syndrome.

Griffith also attests, in October 1996, while at his desk, the chair leg collapsed and he fell backward and suffered a concussion. As a result, he developed memory problems, a stutter, stammering, and word-finding difficulties. Griffith asserts these problems are not permanent and the government does not claim they amount to a mental or physical impairment substantially limiting a major life activity. However, it maintains Griffith's back, neck, and shoulder problems have placed substantial limitations on his major life activities.

At the time of his retirement, Griffith had been on light duty for eight months. His affidavit reflects then and now, he can only walk for about ten minutes and stand for a maximum of 30 minutes. He cannot sit still for any length of time without pain and discomfort. The average person can stand for considerably longer than 30 minutes, *see Martin v. State of Kansas,* 996 F.Supp. 1282, 1286–89 (D.Kan.1998) (finding genuine issue of material fact as to whether plaintiff was disabled where, among other things, he could not stand for more than one hour at a time, and sit for eight hours each day, five days a week, with only a short break in the morning and for lunch); *Perez v. Philadelphia Hous. Auth.,* 677 F.Supp. 357, 360 (E.D.Pa.1987) (finding plaintiff had a physical impairment that substantially limited her activities where her back problems affected, *inter alia,* her ability to walk, sit and stand). The evidence indicates a genuine issue of material fact exists as to whether

Dennis Griffith has a physical impairment substantially limiting major life activities, including standing and walking.

In his deposition, Griffith stated, after his April 1991 injury, and while still a police officer, he made several unsuccessful attempts to obtain an assignment which would not involve patrol duties. He further testified, after the FPPA granted him disability retirement, he contacted Captain Hilburn and asked to be reassigned to a crisis mediator vacancy. The captain replied it was not within his power to make that commitment because he was requesting reassignment to a career service position. According to the deposition testimony of Captain Hilburn, Griffith indicated he was not really interested in working for the City but desired to move into his private business. In his deposition, however, Griffith stated he would have taken a job with Defendants had he been offered one. At minimum, the record reflects a genuine issue for trial as to whether Griffith requested reassignment to a vacant position and as to whether Defendants were obligated to engage in the interactive process of determining such option as a reasonable accommodation.

### 7. *Paul M. Griffith*

Paul Griffith was employed by the DPD from 1987 and worked as a patrol officer until January 1997 when he resigned and then applied and received disability retirement. According to Griffith's testimony, he was injured in August 1995 when he slipped and fell down a grassy, rocky ravine pursuing robbery suspects. Defendants do not contest he is disabled (as a result of a disc disease in his lower back and a left hip condition). Rather, as in the case of Espinosa, they argue Griffith is totally disabled and unable to perform any job, precluding his being a qualified individual with a disability under the ADA.

Here too, the government relies on *Rascon*, 143 F.3d at 1332, where the court held a statement claiming total disability in connection with an application for social security benefits cannot be an automatic bar to a claim of disability. Defendants assert this situation is distinguishable in that Espinosa's deposition testimony is he was so disabled that he could not perform any occupation. Griffith was, however, responding to counsel's questions as to whether he agreed with the doctor's statement at the time of his retirement that he was totally disabled within the meaning of the FPPA used by the FPPA to evaluate a police officer's application for disability retirement. That definition is identical to that used by the Social Security Administration in *Rascon* and, according to Virginia Diamond, Retirement Coordinator of the FPPA, does not mean the person cannot work at all in any job. (Opp'n Defs.' Mot. Summ. J. at 32.) While Griffith's testimony is relevant to a determination as to whether he was a qualified individual under the ADA, it is not determinative of this issue.

Next Defendants argue, even if Griffith were not totally disabled, he would not be a qualified individual with a disability under the ADA because he made no request for reasonable accommodation nor to be reassigned to a Career Service position. Griffith testified, however, that in 1996, on account of his back condition, he asked to be reassigned from patrol to more desk duty as there was an open slot. He was told that he could not work the desk. He believes he should have been transferred to positions under the Career Service authority but did not know that possibility existed.

Griffith resigned during the pendency of disciplinary proceedings stemming from a DPD Internal Affairs Bureau investigation arising out of alleged violations of DPD rules and regulations including disobeying an order, missing court appearances, and departing from the truth. He claims he was given an ultimatum from then Chief of Police Haney that he either resign and apply for his pension and disability or that he would be terminated. He testified he resigned on the day before the disciplinary hearing but that he did so not to avoid the hearing but because he had been given the

ultimatum. Defendants argue Griffith was aware that he could only be dismissed by the Manager of Safety after the Chief of Police had made a recommendation and that he would not have been eligible for transfer or reassignment in light of the pending disciplinary proceedings.

As stated, termination on account of a disability is not a necessary element of a prima facie case under the ADA. A reasonable jury could find, before Griffiths' resignation and as early as 1996, DPD knew he had an impairment rendering him unable to perform the essential functions of the job of police officer and was thus obliged to engage in the interactive process of determining an accommodation, including reassignment to a vacant position.

### 8. *Mark Hernandez*

Mark Hernandez joined the DPD in 1973 and was employed as a patrol officer until February 1994. According to his deposition testimony and affidavit, he was in numerous altercations with suspects and involved in car accidents, culminating in an accident that wrecked his police car. As a result, he injured his head, neck, right elbow, trachea. In 1992 and 1993, Hernandez had to have surgery to remove bone spurs in his trachea that caused him breathing problems. After a car accident in August, 1993 when he re-injured his neck, he was assigned to the Traffic Division, restricted from driving a patrol car and making forcible arrests, until his retirement on January 2, 1994.

Defendants maintain Hernandez does not appear to have any substantial limitation on any major life activity. They point out that immediately after retirement, he went to work full-time as a funeral director and therefore cannot be considered disabled. The government asserts he is substantially limited in the major life activities of breathing and swallowing and his ability to perform simple manual tasks. This assertion is supported by Hernandez' deposition testimony and affidavit. He states at the time of his retirement and currently, he experiences constant headaches, continuous neck pain, difficulty breathing and swallowing, and an inability to lift anything over ten pounds, bend without pain, or look from side to side. He also states he has been able to work as a funeral director because his employer has agreed to modify his duties (no lifting) and schedule to accommodate his disability. A genuine issue for trial exists on the issue of whether Hernandez is disabled within the meaning of the ADA.

Defendants also assert Hernandez is not a qualified individual with a disability because he never requested a reasonable accommodation or reassignment to a Career Service position and would not have accepted reassignment as he had plans to work full-time in the funeral business. Hernandez testified, however, that he did not request reassignment to a Career Service position because he did not think such possibility existed then or now. He iterates this in his affidavit, stating he would have continued to work for the City, had he been able to do so. A reasonable jury could find that Defendants were aware of Hernandez' disability and under an obligation to engage in the interactive process to determine a reasonable accommodation, including the possibility of reassignment. Moreover, a dispute exists as to whether the City's policy discouraged him from making a futile request for reassignment.

### 9. *John Johnson*

John Johnson joined the City as a Career Service employee, working as an Emergency Medical Technician for Denver General Hospital from September 1981 to June 1982, when he left the hospital to go to the DPD. He was employed as a detective and, in May 1996, demoted to patrol officer, a position he held until his separation date of April 14, 1997. He testified he was involved in an altercation with a suspect in February, 1997, injuring his jaw, head, shoulders and back, and was later involved in an incident in which the suspect tried to take his gun away from him. These two incidents and physical limitations from previous work-related injuries

convinced him that his health and welfare were in jeopardy and he could no longer be an effective police officer. He was evaluated and found to be occupationally disabled.

Defendants argue Johnson is not a qualified individual with a disability because he has no substantial limitation on any major life activity. Johnson testified the grip strength in his left hand is approximately half that of that in his right hand and he has difficulty holding and grasping objects in his left hand. In addition, he said his ability to walk, run, stand, sleep, sit, and chew are limited by his impairment. He cannot stand for more than 20 minutes without discomfort nor walk for more than 20 or 30 minutes. The record reflects a genuine issue as to whether Johnson is substantially limited in the major life activities of sleeping, standing, walking, lifting and holding, *see Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d at 1174 (finding lifting to be a major life activity).

Defendants also assert Johnson is not a qualified individual with a disability because he never requested a reasonable accommodation, resigned during the pendency of a DPD Internal Affairs Bureau investigation regarding his misconduct, and did not want a job with the City at that time. The government's position is that Johnson had a disability under the ADA as of February 1997 when he was reinjured in an altercation with a suspect, and that he should have been reassigned at that time. A genuine issue exists as to whether, in 1997, Defendants were aware of Johnson's disability and should have engaged in the interactive process to determine a reasonable accommodation, including the possibility of reassignment to a vacancy of similar or lower rank and pay.

10. *Ronald L. Niebur.*

Ronald L. Niebur joined the DPD in 1969 and was employed as a patrol office until July 16, 1996. According to his affidavit and deposition testimony, he injured his left shoulder in a car accident in 1990. He suffered a left ulnar nerve dislocation and lost the full use of his left arm permanently. At the time of his retirement and currently, Niebur has considerable pain and numbness which radiates from his elbow to his hand. He is forced to perform most tasks with his right hand as he has trouble lifting, gripping, grasping or driving. Defendants argue Niebur does not have any substantial limitation on any major life activity. A genuine issue of material fact exists at minimum as to whether Niebur is substantially limited in major life activities, including lifting, gripping and carrying.

Defendants further argue Niebur is not a qualified individual with a disability because he did not requested a reasonable accommodation or reassignment. In his affidavit, Niebur states he was on limited duty for about a year before retiring and believes he was forced to retire because he could no longer carry a gun or make a forcible arrest and that the DPD made patrol officers retire if they did not recover from injuries. He knew one could not be transferred from the Civil Service to the Career Service. A reasonable jury could find that Defendants were aware of Niebur's disability and obliged to engage in the interactive process of determining the option of reassignment as a reasonable accommodation. It could also find he was discouraged by the no-reassignment policy from making a knowingly futile request for reassignment.

11. *Roseanne Sapirie*

Roseanne Sapirie joined the DPD in 1986 and was employed until May 1996. She was involved in a patrol car accident in September, 1992 and suffered extensive injuries to her neck, shoulder and back. She testified that she has a bulging disk and disseminating disk in her lower back, L–4,5, and chronic muscular spasms in her neck and, due to those conditions, her life has changed drastically.

Defendants argue Sapirie did not and does not have any limitation on any major life activity and that, since retirement, she has worked in law enforcement positions

requiring the ability to shoot a weapon or complete a forcible arrest. In addition, Defendants assert Sapirie is not a qualified individual with a disability as she did not request a transfer to a Career Service position and, when she voluntarily resigned, wrote a complimentary memorandum to the DPD Chief of Police.

According to Sapirie, she has been in constant pain since the 1992 accident and is unable to sit for more than half an hour without having her right side go numb, look above eye level without going dizzy, bend backwards or twist around and reach behind her back, drive, sleep well and do routine manual tasks such as mopping or vacuuming. A year before her retirement, Sapirie found wearing the gunbelt and sitting in a patrol car left her in constant pain. She explained to her supervisor, Captain Hilburn, why she was anxious to find other assignments that would not involve street work and she tried to find such other assignments. She was unsuccessful in her applications for positions of police recruiter and training officer. She also applied for a job with the Mounted Patrol, but, after explaining to the supervisor why she wanted to get off the street, heard no more.

She maintains she did not seek reassignment to the Career Service job because she was aware police officers were barred from such reassignment and, if the DPD learned an officer's injuries prevented him or her from performing patrol duties, the only option was to retire. In her affidavit, Sapirie claims she would have preferred to continue to work for the City. She opted for a service, rather than a disability, retirement, because the former gave her greater monthly payments.

Sapirie testified, before retirement, she purchased land in La Veta, Colorado and moved there after retirement because it was cheaper than remaining in Denver. After three months of rest and living on income from her deferred compensation savings, she looked for a job in the La Veta area, concentrating on law enforcement positions. She rejected the offer of the chief of police of Walsenburg to do criminal investigations for his department because she knew the job did not exist. She was offered a deputy Marshall position with the La Veta Marshall's Office in November 1996 and four months later was promoted to chief of police, a position she currently holds. The Marshall's Office is responsible for La Veta's (a town of 800) law enforcement functions. It is a two-person office, consisting of a deputy marshall and the chief of police. Her duties are mainly administrative. The only time she wears a gunbelt is when she goes on patrol, which is for a maximum of 30 minutes a day. She averages about 2 arrests a month as opposed to about 60 as a DPD patrol officer.

A genuine issue for trial exists as to whether Sapirie suffers from a disability within the meaning of the ADA, taking into account the requirements of DPD police officers. Moreover, the evidence is such that a reasonable jury could find Defendants were aware of her disability and under an obligation to engage in the interactive process to determine a reasonable accommodation, including the possibility of reassignment.

### 12. *Terry Walker*

Terry Walker joined the DPD in September, 1978 and was employed until January 20, 1994. She testified, as a result of horseback riding accident in April 1992, she lost the use of her right peripheral vision and sense of depth perception. Walker's testimony is that the injury left her with a narrow field of focus and problems with balance and equilibrium. As a result, Walker states, she has difficulty driving and, shortly before she retired, the DPD ordered her not to drive her patrol car.

Defendants argue Walker's vision impairment does not rise to the level of a disability under the ADA. Courts have however held a plaintiff may be substantially limited in the major life activity of seeing where he or she suffers from limit-

ed peripheral vision and is incapable of sensing depth. *See Doane v. City of Omaha,* 115 F.3d 624, 627–28 (8th Cir.1997). Moreover, Walker's vision is uncorrectable as opposed to that of the plaintiffs in *Sutton v. United Air Lines,* where the Tenth Circuit found two sisters with correctable visual impairments not to be disabled under the ADA, but noted had their vision been uncorrectable, it would have substantially limited their major life activity of seeing. 130 F.3d at 902–3. A genuine factual issue exists that may reasonably be resolved in favor of either party as to whether Walker's vision impairment substantially limits the major life activities of seeing, walking, balancing and driving.

Defendants assert Walker is not entitled to relief as she did not want to be reassigned to a Career Service position before or at the time of her retirement from the DPD and told Lieutenant Cooper that she was not interested in other City employment. According to Walker's deposition testimony, however, she made a formal request for reassignment when she talked with then Sergeant Cooper and was refused a request to transfer to a Career Service position, specifically to a position in the photo lab, which became civilianized while she occupied it. She also testified to having contacted various units in the DPD to see if she could stay on as a police officer in other units in jobs she believed she could perform. She was informed she could not transfer to these positions nor be hired to perform like positions with other law enforcement agencies and that she was going to be retired.

Genuine issues exist as to whether Defendants were aware of Walker's disability in 1994 and should have engaged in the interactive process to determine a possible reasonable accommodation (including reassignment) and as to whether the City's policy discouraged her from making a futile request for reassignment.

### 13. *Alan Wodack*

Alan Wodack joined the DPD in June, 1970 and was employed until June, 1996. His affidavit states during his 26–year career as a patrol officer, he injured his back several times as a result of auto accidents, "slip and fall" incidents, and suspect resistance incidents. His back has been fused in three surgeries, two of which resulted in the nerves in his hands and left leg being destroyed. As a result, both his little fingers and half of his ring finger are numb and the back sides of his hands tingle painfully all the time.

Defendants contend Wodack's back and nerve damage do not substantially limit any major life activity. Wodack states he is limited in his ability to stand from permanent numbness in his left foot and toes; has left sciatic nerve pain, and "foot drop," precluding his from taking a firm step with his left leg. According to the affidavit, he cannot stand long enough to shave his face without modifying his position by balancing his leg on an object. Defendants assert he is not substantially limited in major life activities because he can do some construction tasks. Wodack states he has trouble lifting, bending, reaching, standing and doing manual tasks and can only do construction work on his property because he has modified the way he does such tasks. As an example, to avoid bending, he must sit on the ground when doing tasks that are normally performed standing. He also needs to take frequent breaks, use a dolly to move boxes for a distance of twenty feet, and rest due to loss of the strength in his hands. Construing the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party, genuine issues of material fact exist as to whether Wodack is and was substantially limited in the major life activities of standing, bending, lifting and grasping.

According to Wodack's affidavit, after his 1995 surgery, he realized he could not make a forcible arrest because of his back impairment and he was not able to do the job of patrol officer. Defendants assert Wodack is not entitled to relief because he did not want to be reassigned to a Career Service position before or at the time of

his retirement from the DPD and that he retired because he wanted to move to Kansas. Wodack testified he moved to Kansas because he knew he was not going to be placed in another position within the DPD and he did not request reassignment because Lieutenant Cooper told him, if he were not able to perform an arrest, he could no longer be a police officer as the department would not make any concessions or positions available for anyone who had a disability and could not perform the duties of a police officer. The record thus includes evidence from which a reasonable jury could find that Defendants were aware of Wodack's disability and ought to have engaged in the process of determining a reasonable form of accommodation, including reassignment to a vacant position. Moreover, a dispute exists as to whether DPD's "no-reassignment" policy discouraged Bender from making a futile request for reassignment.

### V. *Conclusion.*

I have already determined Defendants' policy of "no reassignment" to Career Service positions violates the ADA. The United States has identified thirteen former officers of the DPD, allegedly disabled under the ADA, who should have been reassigned to vacant Career Service positions. For the aforesaid reasons, I conclude the evidence presents a sufficient disagreement to require submission to a jury on the issue of whether the United States is entitled to claim relief on behalf of each named claimant. I therefore deny Defendants' summary judgment motion. Accordingly,

IT IS ORDERED THAT Defendants' Motion for Summary Judgment is DE-NIED;

IT IS FURTHER ORDERED THAT, on or before July 6, 1999, the parties shall submit a Further Amended Pretrial Order;

IT IS FURTHER ORDERED THAT the parties shall comply with the Memorandum on Pretrial and Trial Procedures, Part II (Instructions for Preparation and Submission of Pretrial Order) and, on or before July 6, 1999, the parties shall sub-

mit to court the jury instructions packet (as described in Part II), both in print and on a 3.5″ computer disk compatible with WordPerfect 6.1;

IT IS FURTHER ORDERED THAT a Pretrial Conference will be held on Thursday, July 15, 1999 at 9:30 a.m. in Courtroom C–401;

IT IS FURTHER ORDERED THAT the parties shall confer, and, at the time of the Pretrial Conference, provide the court with their respective lists of exhibits, reflecting those which are to be admitted by stipulation and those to which the other side objects.